IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| CANDICE PASCHAL and PEDRO ZARAZUA, JR., *individually and on behalf of all others similarly situated*, | § § § § | |
| Plaintiffs, | § § | |
| v. | § § | 1:22-CV-27-RP |
| PERRY'S RESTAURANTS LTD *d/b/a* PERRY'S STEAKHOUSE AND GRILLE, and CHRISTOPHER V. PERRY, *individually*, | § § § § | |
| Defendants. | § § | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

From March 31 through April 1, 2025, the Court held a bench trial in this matter. (Dkts. 209, 210). Plaintiffs Candice Paschal and Pedro Zarazua, Jr., individually and on behalf of all others similarly situated, ("Plaintiffs") and Defendants Perry's Restaurants LTD doing business as Perry's Steakhouse and Grille and Christopher V. Perry, individually, ("Defendants" or "Perry's") submitted post-trial proposed findings of fact and conclusions of law, (Defs.' Proposed Findings of Fact, Dkt. 216; Pls.' Proposed Findings of Fact, Dkt. 219), and closing briefs, (Pls.' Br., Dkt. 218; Defs.' Br., Dkt. 217). The parties also appeared for closing arguments on their briefs on July 10, 2025. (Dkt. 222). Having considered the evidence and testimony presented at trial, the arguments of counsel, the briefing, and the governing law, the Court enters the following findings of fact and conclusions of law.

## I. BACKGROUND

Plaintiffs are a group of about 750 servers who worked at Perry's between January 11, 2019 and January 11, 2022. (Report and Recommendation of the United States Magistrate Judge, Dkt. 176 (adopted as this Court's Order, Dkt. 180) (hereinafter "R. & R."), at 1−2). Plaintiffs allege that

1

Perry's took a portion of their tips to fund its tip pool and used the funds to pay employees who were working morning shifts while the restaurants were closed to the public. (*Id.* at 3, 19–20). Plaintiffs argue that Perry's policy of requiring them to share their tips with off-hour employees, who were assigned cleaning and pre-opening tasks before the restaurant was open, violated the Fair Labor Standards Act ("FLSA"). (*Id.* at 2).

By way of procedural background, on January 11, 2022, Plaintiffs Candice Paschal and Pedro Zarazua filed this lawsuit against Defendants, Perry's Restaurants Ltd. and Christopher V. Perry ("Perry's"). (Compl., Dkt. 1). Following discovery, Plaintiffs filed a motion for partial summary judgment arguing that Plaintiffs were entitled to summary judgment on liability because Perry's failed to carry its burden to show that its tip pool was lawful in certain weeks identified in Perry's records. (Pls.' Partial Mot. Summ. J., Dkt. 161). This Court granted in part and denied in part Plaintiffs' Partial Motion for Summary Judgment. (R. & R., Dkt. 176, at 22). In doing so, this Court found as a matter of law that Defendant Perry's Restaurants Ltd. violated the FLSA by compensating so-called "AM Busser" employees, who worked before the restaurant was open, from its mandatory tip pool. (R. & R., Dkt. 179, at 19–21). As to all other employees alleged to be unlawfully included in the tip pool distributions, the Court found material fact issues. (*Id.*). The Court also granted Defendants' Motion for Partial Summary Judgment, (Dkt. 151), as to Plaintiffs' related side work claim. (*Id.* at 22). During the March 21, 2025 pretrial conference conducted by the Court with counsel for the parties, and again at the start of the March 31, 2025 bench trial, Plaintiffs represented to the Court that they were abandoning their side work and tools and uniform claims. (Trial Transcript (hereinafter "Tr.") Vol. I, at 262:3–262:12; *id.* at 22:24–23:8). Given that Plaintiffs' motion for partial summary judgment was granted on the issue of the AM Bussers' eligibility to receive funds from the tip pool, the issues remaining for trial were (1) Perry's liability for tip pool

violations as to categories of employees other than the AM Bussers, and (2) damages for all tip pool violations.

At trial, the Court heard testimony from four witnesses who had worked as servers and/or off-hour employees at Perry's—Isabella Covarrubias, Madison Post, Kenedi Peterson, and Sara Smith—as well as Perry's Chief Operating Officer Richard Henderson ("Henderson"), Perry's Director of Human Resources and Defendant Christopher Perry ("Mr. Perry"), Perry's Senior Director of Human Resources Gary Gutierrez, Perry's Associate Vice President of Operations Howard Cortes, Perry's Senior Director of Operation Support Rebecca Munns, and two data analysts addressing damages—Shane Grahn and Muskan Garg. The Court's findings of fact and conclusions of law follow.

## II. SUMMARY OF THE EVIDENCE

### A. Perry's Status as a Covered Employer

The parties have stipulated that Defendant Perry's Restaurant Ltd. is an employer as defined under the FLSA. Defendant Perry's Restaurants Ltd. is a Texas limited partnership and does business as "Perry's Steakhouse and Grille." (Stipulated Facts, Dkt. 184-1, at 3). Perry's Restaurants Ltd. is an "enterprise engaged in commerce" and covered by the FLSA as a result. (*Id.*); 29 U.S.C. § 203(r)−(s). Defendant Perry's Restaurants Ltd. employed Plaintiffs and acted as an employer for Plaintiffs under the FLSA. (Stipulated Facts, Dkt. 184-1, at 3).

Mr. Perry is the sole owner, CEO, and President of Perry's Restaurants Ltd. (Tr., Vol. I, at 173:23−25; Tr., Vol. II at 6:9). Mr. Perry has significant involvement in the day-to-day operations of the restaurants. (Tr., Vol. II, at 9:14−24; *see also* Pls.' Trial Exhibit (hereinafter "Ex.") 28, at 2, Pls.' Ex. 29, Pls.' Ex. 30, Pls. Ex. 257). As part of the leadership team, Mr. Perry attends meetings with four other senior employees to discuss issues related to managing the restaurant, such as the guest dress code. (Tr. Vol. I, at 173:19−175:2). Other issues discussed by Mr. Perry and the senior

leadership team include the restaurant's balloon policy, manager pay, private dining pay, and staffing levels. (Tr. Vol. I, at 175:4−175:22). The senior leadership agenda has also included tips and tip share. (Tr. Vol. I, at 177:16−21). Mr. Perry, along with Henderson, was involved in setting the mandatory tip share percentage taken from employees' pay checks at 4.5%. (*See* Pls.' Ex. 28, at 2, Pls.' Ex. 31; Tr. Vol. I at 186:5−18 (Henderson testifying that Mr. Perry "would have been involved in setting the rate of 4.5 percent.")).

Beyond meeting with the senior leadership, Mr. Perry has otherwise played a role in restaurant management and in setting restaurant policies for operation. (Tr. Vol. II, at 15:9−22, Tr. Vol. I, at 173:16−22, 174:13−21, 183:19−184:25; *see also* Pls.' Ex. 41, Pls.' Ex. 39, Pls.' Ex. 35, Pls.' Ex. 257). Topics within Mr. Perry's portfolio have included employee labor costs and staffing, (Pls.' Ex. 29), server training, (Pls.' Ex. 52), general manager salaries, (Pls.' Ex. 30), personnel actions, (Pls.' Ex. 38), floor cleaning procedures, (Pls.' Ex. 41), customer interaction scripts, (Pls.' Ex. 43), and employee uniforms, (Pls.' Ex. 48). (*See also* Tr. Vol. II, at 7:7−22, 8:2−23, 9:14−24, 12:17−13:23, Tr. Vol. I, at 174:13−175:13). Employees send questions about topics ranging from the type of plateware used at the restaurant to job duties of different roles to Mr. Perry. (Tr. Vol. II, at 7:7−22; *see also* Pls.' Ex. 42, Pls.' Ex. 43, Pls.' Ex. 45-B1, Pls.' Ex. 46-A, Pls.' Ex. 51, Pls.' Ex. 52, Pls.' Ex. 53, Pls.' Ex. 54).

Mr. Perry has set policies and made decisions related to hiring managerial and senior level positions. (Pls.' Ex. 35; Tr., Vol. I, at 184:2−10, 184:21−25, 185:6−10). Mr. Perry has also been involved in the hiring and promotion of upper-level management. (Tr., Vol. II, at 9:1−12; *see also* Pls.' Ex. 35). Employees in various positions and levels of management report directly to Mr. Perry. (Tr., Vol. I, at 173:9−15, 174:1−8, 185:1−5; *see also* Pls.' Ex. 311).

### B. Perry's Hours

Perry's operates fine-dining steakhouse restaurants with multiple locations throughout the United States, including thirteen restaurant locations in Texas at issue in this lawsuit. (*See* Tr. Vol. II, at 27:6−8; 28:2). During the period at issue in this case, all thirteen Perry's locations in Texas opened at 4:00 pm every day, except on Fridays and certain holidays. (R. & R., Dkt. 176, at 19 n. 5). On Fridays and certain holidays, Perry's locations in Texas opened at 10:30 a.m., except for two locations: (1) the Memorial location which also opened for lunch at 11:00 am on Mondays through Thursdays; and (2) the Park District (previously, Uptown) location also opened for lunch at 11:00 am on Mondays through Thursdays until September 11, 2020. (*Id.*). The five holidays Perry's opened for lunch included Easter, Father's Day, Mother's Day, Thanksgiving, and Christmas Eve. (Joint Proposed Stipulated Facts, Dkt. 184-1, at 5).

### C. Plaintiffs' Employment at Perry's

Plaintiffs worked for Perry's as servers at one or more of Perry's restaurant locations in Texas. Perry's paid all servers, including Plaintiffs, a direct subminimum hourly wage of $2.13 while working for Perry's as servers. (R. & R., Dkt. 176, at 2; *see also* Tr., Vol I, at 185:20−23). This was a practice consistent across all Perry's locations in Texas. (*Id.*).

### D. Perry's Use of a Tip Pool

Perry's implemented the same "tip share" or "tip pool" policy across all Perry's restaurant locations. Servers at Perry's were required to turn over a portion of their tips to Perry's each week in the amount of 4.5% of their total sales for a mandatory tip pool. (Joint Proposed Stipulated Facts, Dkt. 184-1, at 5). The mandatory tip pool was used to pay other staff, including server assistants, bartenders, service wells, food runners, and hosts. The job codes that Perry's created and designated as tip pool recipients included 300 (host), 400 (food runner), 500 (busser), 950 (server assistant), 200 (bartender), and 275 (service well). (Pls.' Ex. 313, Pls.' Ex. 148).

Perry's used the tip pool to pay both staff that worked before 4:00 pm when the restaurant was not open (which the parties referred to as "AM" staff) and staff that worked after 4:00 pm when the restaurant was open (which the parties referred to as "PM" staff). As one caveat, staff working before 4:00 pm on a Friday or holiday, when the restaurant was open, would not be considered "AM staff." The Court uses the term "AM" in its findings to mean staff beginning their shifts before 4:00 pm when the restaurant was not open (excluding those working during opening hours on Fridays or holidays) and finishing their shift before 5:00 pm. Perry's used tips from the tip pool to pay the wages of employees in the busser, host, and similar job codes who worked their entire or nearly their entire shift when the restaurant was closed. (R. & R., Dkt. 176, at 16; *see also* Tr. Vol. I, at 41:14−42:17; *see also* Pls.' Ex. 371 (listing AM Shifts worked in the tip-pool recipient job codes)). Thus, assuming customers left about a 20% gratuity, Perry's took about one quarter of each servers' tips to place into the tip pool to pay other staff, including both AM and PM staff. The tips Perry's collected from servers were distributed weekly to pay employees for their work across the entire week. (Joint Proposed Stipulated Facts, Dkt. 184-1, at 5).

Perry's adopted this model to even out the employees' wages across all shifts. Henderson testified that the weekly tip pool enabled Perry's to reduce "fluctuation" among wages and "retain the best people." (Tr., Vol. I, at 246:13−19). As one example, Henderson explained that Perry's weekly tip pool allowed it to distribute the larger amount of tips generated on a Friday night to employees who worked at a slower time, such as a Tuesday. (*Id.*).

### E. Duties of Employees Included in the Tip Pool

Because the restaurant was not seating customers from the public before 4:00 pm (except on Fridays or holidays), those employees who worked in the AM shifts focused on preparing the restaurant for opening to the public. (*E.g.*, Pls.' Ex. 1 through Pls.' Ex. 12 (checklists of tasks to be completed by the AM Bussers); Tr., Vol. II, at 114:17−20, 115:7−9)). The job duties of the AM

Bussers and Hosts included cleaning restrooms, sweeping and scrubbing floors, sweeping debris in the parking lot, checking the landscaping and for trash in flower beds, polishing dirty exterior glass around the restaurant, cleaning, sweeping, and setting the patio, polishing silverware, restocking, and preparing kitchen items. (R. & R., Dkt. 176, at 19). The Court gives a brief overview of each category of AM Employees' duties below.

*AM Bussers*: The Court has entered partial summary judgment holding that "Perry's has not carried its burden to show that the morning bussers qualify as tipped employees under the FLSA who can be included in Perry's tip pool." (R. & R., Dkt. 176, at 22). The Court held that the AM Bussers did not have opportunities for more than de minimis customer interaction. (*Id.* at 20). In some instances, individuals worked entire shifts under the "busser" job code before the restaurants were open to the public. (*See* Pls.' Ex. 359). In other instances, the AM Bussers' shifts ended between 4:00 pm and 5:00 pm, just after the restaurant had opened. (*Id.*). The evidence reflects that for employees who worked the AM Shift, cleaning and other preparation duties would extend until just after the restaurant had opened and would end between 4:00 pm and 5:00 pm. (*See* Tr. Vol. I, at 84:17−22; Tr. Vol. I, at 92:24−95:1). By contrast, AM Bussers did not have opportunities to more-than-minimally interact with customers while completing their morning cleaning and preparation duties between 4:00 pm and 5:00 pm. (*Id.*).

*AM Food Runner and Server Assistants*: Perry's employed individuals who performed the AM Busser job, i.e., who worked primarily before the restaurant had opened and performed various duties to prepare the restaurant to open to the public, but clocked-in under either a "food runner" or "server assistant" job code. (Tr. Vol. I, at 38:18−39:3, 39:12−40-9, 60:8−62:17). Like the employees who clocked in as AM Bussers, these AM employees who worked under other job codes in the morning shifts performed cleaning and restaurant preparation tasks. (Tr. Vol. at 41:3−13

(employee witness testifying when the restaurant is closed "[y]ou don't have anybody coming in," and that as a result, she had no customer interaction)).

*AM Host*: Perry's employed a category of employees called "AM Hosts" beginning in 2021 who typically worked from 11:00 am or 12:00 pm until 3:00 pm. (Pls.' Ex. 197, at 2; Pls'. Ex. 286, at 1). Perry's had a set of standardized tasks for the AM "host" opening duties. (Pls'. Ex. 135 (AM Host checklist including tasks such as wiping down the door, arranging mint bowls, gathering rose petals, cleaning menus, and wiping down signs); Pls.' Ex. 196 (email from Howard Cortes to Pery's locations describing AM Host role as including sweeping, disinfecting door handles, restocking coat check tags, cleaning and organizing closets, and assisting with to go box stickers); *see also* Tr. Vol. II, at 51:8−52:21 (employee witness testifying that AM Hosts perform duties including sweeping leaves, wiping menus, vacuuming carpets, and spraying down the glass door); Tr. Vol. I, at 74:12−76:25 (employee witness testifying that she completed the tasks set forth in Pls.' Ex. 135 and Pls.' Ex. 196, as well as additional cleaning tasks, during her AM Shifts); Tr. Vol. I at 73:1−5 (employee witness testifying that she used the checklist as an AM Host). The duties on the list included: "Wipe down all glass in Host area," "Wipe down Perry's stanchion sign outside," "Sweep front area," "Roll out & vacuum mats/carpet," and "Restroom check." (Pls.' Ex. 135). One witness, Kenedi Peterson, who worked as an AM Host, testified at trial that 80% of her AM Host duties involved cleaning and restaurant preparation tasks. (Tr. Vol. I, at 77:1−11).

The customer interactions handled by the AM Hosts were minimal because the shift occurred entirely or almost entirely during the restaurant's closing hours. It was "not very often" according to employee witness Madison Post that the AM Host had any in-person contact with customers during the morning shift. (Tr. Vol. I, at 59:9−13). In her experience, about "once a week" a customer came by knocking on the front door to pick up a credit card. (*Id.*). One employee testified that at their Perry's locations, the doors were locked before opening time, so customers

could not enter the restaurant and interact with the AM Hosts. (Tr. Vol. I, at 77:9−11 ("[S]ince the doors were locked, we didn't frequently get anyone interacting with us.")). Customers "very rarely" entered the restaurant seeking a gift card or to search for a lost item. (Tr. Vol. I, at 80:11−21). However, these interactions did not lead customers to leave tips. (Tr. Vol. I, at 68:9−11).

AM Hosts also held administrative duties, specifically answering the phone. The AM Host on duty would answer the main line and transfer calls to different people. (Tr. Vol. I, at 77:5−11, 79:2−6; Tr. Vol. II, at 135:8−12 (AM Hosts intended to help managers and improve number of incoming calls going unanswered); Tr. Vol. II, at 117:9−15 (employee witness testifying that there was one main line and the AM host handled all incoming calls, including calls from vendors). "[A] lot of the time" the calls were from vendors, people with general inquiries for different locations in other states, and Perry's corporate staff requesting to speak with the manager. (Tr. Vol. I, at 79:10−80:10).

AM Hosts also called people with reservations to confirm their booking, a responsibility which may take "30 minutes to an hour" of a given shift according to one witness. (Tr. Vol. I, at 57:10−13). The evidence does not give rise to any inference that the phone calls to customers to confirm reservations yielded a tip for the AM Hosts. (Tr. Vol. I, at 80:22−81:3). By contrast, one employee testified that the phone calls "interrupted" or irritated potential customers. (Tr., Vol. I, at 78:22−79:1, 78:15−21). One witness estimated that "75 to 80 percent of the time, [she] would leave a voicemail" when calling to confirm reservations and therefore would not speak directly with the customer. (Tr., Vol. I, at 77:23−78:2). Customers also would use the OpenTable app to confirm a reservation, reducing the number of calls made. (Tr., Vol. I, at 77:17−22).

*Service Well/Bartender*: Perry's also employed a "service well" position which received payment from the tip pool. (Tr. Vol. I, at 64:5−9). The duties of the service well included to "prep cocktails, get all the wine, alcohol, all the garnishes," "make the drinks as they would come in, place them on

the shelf, and then, the server would go take them and then, go out the kitchen and bring them to the table." (Tr. Vol. I, at 63:8–14). The service well worked in a "separate space" located in the back of the house at six of the Perry's locations at issue, but in a more central location in view of customers at others. (Tr. Vol. II, at 44:14–23). Perry's corporate representative acknowledged at trial that the role of the service well was "not customer facing necessarily." (Tr. Vol. II, at 43:9–13; *see also* Pls. Ex. 143). When the service well worked in a separate space, they received a flat hourly rate. (Tr. Vol. II, at 45:1–5). But when the service well employees worked "behind the bar in the main area," when the bar was open, they had opportunities to interact with customers "all the time" and were included in the tip pool distributions. (Tr. Vol. II, at 43:19–44:3). Bartenders, by contrast, made drinks for guests sitting in front of them and engaged with them directly. (Tr. Vol. II, at 43:16–18).

### F.  Perry's Knowledge of FLSA Requirements

Perry's has been involved in previous litigation about FLSA requirements, a fact Perry's does not dispute. (Tr. Vol. I, at 188:9–14). In fact, Perry's has been involved in FLSA litigation continuously since 2009. (*Id*.). In 2003, Perry's was subject to a full investigation by the Department of Labor ("DOL") and was found in violation of the FLSA on multiple grounds including operating an unlawful tip pool. (Tr. Vol. I, at 189:7–190:7; Pls. Ex. 340). More specifically, Perry's was liable for violations of the FLSA because it required employees to contribute to purchase uniforms and distribute tips to Private Event Coordinators. (Tr. Vol. I, at 189:7–190:7; Pls.' Ex. 340, at 2–6).

Since the DOL investigations in 2003, Perry's has been involved in other litigation regarding FLSA violations. *See, e.g., Steele v. Perry's Rest., LLC*, No. H-09-2789, 2015 WL 10438848 (S.D. Tex. Feb. 24, 2015) (tip credit violations), *aff'd sub nom., Steele v. Leasing Enters.*, 826 F.3d 237 (5th Cir. 2016); *Hoenninger v. Leasing Enters.*, No. 1:14-CV-798-LY, 2018 2018 WL 6843709 (W.D. Tex. May 30, 2018) (same), *aff'd*, 803 F. App'x 756 (5th Cir. 2020); *Shaffer v. Perry's Rests., Ltd.*, No. SA-16-CA-01193-FB, 2017 WL 10841217, at *5 (W.D. Tex. Aug. 7, 2017) (same); *Berger v. Perry's Steakhouse of*

*Ill., LLC*, No. 14 C 8543 (N.D. Ill. Oct. 1, 2020) (same); *Helgason v. Perry's Rests., Ltd.*, No. 3:20-cv-1573 (N.D. Tex. Nov. 10, 2021) (same); *Martinez v. Perry's Rests. Ltd.*, No. 1:21-cv-01053-RP (W.D. Tex. May 22, 2023) (same); *Green v. Perry's Rests. Ltd*, No. 21- CV-0023-WJM-NRN (D. Colo. Nov. 7, 2022) (same). Perry's corporate representative testified that these lawsuits involved the same issues as the present case. (Tr. Vol. I, at 191:11–24; Tr. Vol. I, at 192:16–22; Tr. Vol. I, at 192:12–15; Tr. Vol. I, at 195:1–196:3; Tr. Vol. I, at 196:4–8; Tr. Vol. I, at 197:9–22). Despite its frequent involvement in litigation, Perry's did not contend that its tip pool arrangements were modified because of legal advice it obtained after recent litigation. (Tr. Vol. I, at 193:21–194:13 (Henderson testifying that he did not recall any changes based on legal advice since the *Shaffer* case); Tr. Vol. I at 194:9–13 (Henderson testifying he did not recall any changes to the tip pool based on legal advice after the *Berger* case); Tr. Vol. I at 197:19–22 (Henderson testifying no changes were made to the tip pool based on legal advice since at least some time before the *Helgason* case)).

Perry's received "many" questions from employees asking about the tip pool, tip pool contributions, and distribution of servers' tips from the tip share to recipients. (Tr. Vol I, at 245:15–246:8). As one example, Perry's received a National Labor Relations Board ("NLRB") Complaint stating that one of Perry's servers thought that the tip pool was illegal. (Pls.' Ex. 147-A (NLRB Charge, Aug. 8, 2022)). Specifically, the NLRB Charge that Perry's received stated that an employee asked her general manager questions about the tip pool and expressed "concerns about whether the tip pool was being paid out legally and requested that the company provide us with documentation about the pool and where tips were being paid." (Pls.' Ex. 147-A, at 5; *see also* Tr. Vol. I, at 202:12–203:10). Perry's terminated the employee who raised questions about the tip pool and the legality of the tip pool. (Tr. Vol I, at 244:4–25; *see also* Pls.' Ex. 147; Pls.' Ex. 147-A (NLRB Charge, Aug. 8, 2022)).

At trial, Perry's corporate representative testified that Perry's did not ask for legal advice about whether the AM employees working exclusively when the restaurant was closed could be included in the tip pool. Henderson stated, "I'm not aware that that would be a question that needed to be asked." (Tr. Vol. I, at 200:2−12). Perry's corporate representative also did not recall the company seeking any legal advice specifically when it decided to begin including AM Hosts in the tip pool in 2021. (Tr. Vol. I, at 201:8−202:2).

### III. DISCUSSION

#### A. Legal Standard

The Court's articulation of the relevant legal standard was set forth in its Order granting partial summary judgment and will not be revisited. The law-of-the-case doctrine "'posits that when a court decides upon a rule of law, that decision should continue to govern the same issue in subsequent stages in the same case.'" *June Med. Servs., L.L.C. v. Phillips*, 22 F.4th 512, 519 (5th Cir. 2022) (quoting *Med. Ctr. Pharmacy v. Holder*, 634 F.3d 830, 834 (5th Cir. 2011)).

For reference, the Court will briefly summarize its analysis as set forth in its Order granting summary judgment. Congress enacted the FLSA in 1938 "with the goal of 'protecting all covered workers from substandard wages and oppressive working hours.'" *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 147 (2012) (citation omitted). Under the tip credit exemption, employers are permitted to pay tipped employees $2.13 per hour—significantly below the minimum wage— "under the theory that a large portion of such employees' total earnings comes from tips." *Restaurant Law Ctr. v. United States Dep't of Lab.*, 120 F.4th 163, 166 (5th Cir. 2024) (citing 29 U.S.C. § 203(m)). To use the tip credit exemption, the employer must inform the employee of any required tip pool contribution and allow the employee to retain all the tips received or "pool" the tips "among employees who customarily and regularly receive tips." 29 U.S.C. § 203(m)(2)(A). "If the employer fails to meet either of these requirements, it is not eligible to claim the tip credit, and in such a case,

the employer must pay each employee the full minimum wage of $7.25 an hour that is required under section 206." *Pedigo v. Austin Rumba, Inc.*, 722 F. Supp. 2d 714, 721 (W.D. Tex. 2010).

### 1. Burden of Proof

Application of an exemption under the FLSA "is a matter of affirmative defense on which the employer has the burden of proof." *Corning Glass Works v. Brennan*, 417 U.S. 188, 196−97 (1974); *see also E.M.D. Sales, Inc. v. Carrera*, 604 U.S. 45, 54 (2025) (holding that "the preponderance-of-the-evidence standard applies when an employer seeks to show that an employee is exempt from the minimum-wage and overtime-pay provisions of the Fair Labor Standards Act"); *Steele*, 826 F.3d at 242 ("The employer carries the burden to prove its entitlement to a tip credit."). Courts "construe the FLSA liberally in favor of employees, and exemptions 'are to be narrowly construed against the employers seeking to assert them.'" *McGavock v. City of Water Valley, Miss.*, 452 F.3d 423, 424 (5th Cir. 2006) (quoting *Arnold v. Ben Kanowsky, Inc.*, 361 U.S. 388, 392 (1960)).

### 2. Dual Jobs Regulation

In 1967, the year after Congress amended the FLSA to include the tip credit, DOL issued its "dual jobs" regulation, addressing employees who regularly engage in distinct occupations for the same employer. *Restaurant Law*, 120 F.4th at 166−67. The dual jobs regulation provides that "[i]n some situations an employee is employed in a dual job, as for example, where a maintenance man in a hotel also serves as a waiter. In such a situation the employee, if he customarily and regularly receives at least $30 a month in tips for his work as a waiter, is a tipped employee only with respect to his employment as a waiter." 29 C.F.R. § 531.56(e). "Such a situation is distinguishable from that of a waitress who spends part of her time cleaning and setting tables, toasting bread, making coffee and occasionally washing dishes or glasses . . . Such related duties in an occupation that is a tipped occupation need not by themselves be directed toward producing tips." *Id.* As this Court has held, (R. & R., Dkt. 176, at 12), *Restaurant Law* left in place the DOL dual jobs regulation. (*Id.*).

### 3. Customer Interaction Test

Because the FLSA does not define who qualifies as an employee who "customarily and regularly receives tips," when asking whether an employee is a tipped employee, courts have looked to legislative history, DOL rules and guidance, case law, and the extent of the employee's customer interaction. *Restaurant Law*, 120 F.4th at 166−71; *Montano v. Montrose Rest. Assocs., Inc.*, 800 F.3d 186, 190−94 (5th Cir. 2015); *Pedigo*, 772 F. Supp. 2d at 728−30.

In *Montano*, the Fifth Circuit addressed whether a "coffeeman" who worked in the kitchen and did not directly serve customers qualified as an employee who "customarily and regularly receive tips" under the tip pooling provision in Section 203(m). 800 F.3d at 187. The Fifth Circuit first considered DOL rules and guidance, including the DOL Field Operations Handbook, which provided examples of restaurant occupations that "customarily and regularly receive tips" and those that do not. *Id.* at 190−91. Waiters/servers, bellhops, counter personnel who serve customers, bussers, and service bartenders are listed as tipped occupations, while janitors, dishwashers, chefs, cooks, and laundry room attendants are listed as non-tipped occupations. *Id.* The court noted that "these categories correlate directly with those contemplated by Congress when it first promulgated Section 203(m)." *Id.* at 191 n.9 (quoting S. Rep. 93-690, at 43). Further, the *Montano* Court noted that DOL "opinion letters make clear that one's status as an employee who 'customarily and regularly receives tips' is 'determined on the basis of his or her activities,' not on the employee's job title." *Id.* at 191 (citations omitted). For example, chefs, dishwashers, and janitors, who have little to no interaction with customers, are not eligible to participate in a tip pool, but "sushi chefs who work at a counter in the dining room and directly serve customers may participate in tip pools." *Id.*

The court held that, in determining whether an employee customarily and regularly receives tips, a court—or a factfinder—must consider the extent of an employee's customer interaction. The factfinder should also consider whether the employee is engaging in customer service functions.

Even an employee who works in the dining room will not be considered a tipped employee if his work is not customer service-oriented, for example, an electrician who is repairing a chandelier for the restaurant. *Montano*, 800 F.3d at 193. The court held that even though the coffeeman may "directly aid[] in serving diners" and carry out work that is "important for direct diner service," "[m]any traditionally nontipped employees aid waiters and are important for direct diner service. Indeed, it is difficult to imagine more important contributions to diner satisfaction than providing a meal (a chef) and clean silverware with which to eat it (a dishwasher)." *Id.* But "[t]o customarily and regularly receive tips requires more." *Id.* The difference between employees who are customarily and regularly tipped and those who are not "is that the former work primarily in the front of the house where they are seen by and interact with customers, while the latter work primarily or exclusively in the back of the house." *Id.*

The Fifth Circuit found a genuine issue of material fact as to whether the coffeeman was eligible to participate in a mandatory tip pool because of a "genuine issue of fact about whether the coffeeman had *any* interaction with the diners who left the tips." *Id.* at 194 (emphasis in original). The court remanded the case to determine whether the coffeeman's interaction with customers was enough to qualify him as an employee who "customarily and regularly receives tips." *Id.* at 195. In sum, *Montano* directs courts to "consider whether the employee is engaging in customer service functions." 800 F.3d at 193. The court noted that the coffeeman spent "most" of his time in the kitchen making coffee and had de minimis interaction with customers (once per week). *Id.* at 194. The coffeeman did not take orders or pour water for customers. *Id.* From this evidence, "a factfinder could find that the coffeeman did not customarily and regularly receive tips." *Id.*

The Fifth Circuit returned to the issue of who qualifies as a "tipped employee" under the FLSA in 2024. In *Restaurant Law*, 120 F.4th at 166, restaurant industry groups challenged a DOL rule, 29 C.F.R. § 531.56(f), which defined "what it means to be "engaged in a tipped occupation"

under the FLSA. As this Court has held, (R. & R., Dkt. 176, at 12), *Restaurant Law* did not discuss or overrule the *Montano* customer interaction test either expressly or implicitly.[1] This Court has already concluded that both decisions bind the Court. (R. & R., Dkt. 176, at 12).

4. Workweek Rule

In its summary judgment order, this Court held that it follows most courts that have addressed this issue and finds that the workweek rule is inapplicable to improper tip credit claims. (R. & R., Dkt. 176, at 16–18 (collecting cases)). As such, the Court analyzes the off-hour employees' duties during those specific shifts, not the duties an employee may have performed over the course of the entire workweek.

**B. Plaintiffs' FLSA Claim**

1. Statute of Limitations

"In a FLSA collective action, the statute of limitations for a named plaintiff . . . runs from the date that the plaintiff files the complaint, while the limitations period for an opt-in plaintiff runs from the date the written opt-in consent is filed in court." *Tarango v. Chemix Energy Servs., LLC*, No. SA-18-CV-00370-XR, 2021 WL 1269905, at *2 (W.D. Tex. Apr. 6, 2021). The Court granted, in part, Plaintiffs' Motion for Notice. (R. & R., Dkt. 78; Order adopting R. & R., Dkt. 87). The Court also granted a sixty-day opt-in period for the putative collective members to return and file their consent form with the court. (Dkt. 91). Plaintiffs filed the Advisory of Transmitting the Initial Court-Approved Collective Action Notices pursuant to the Court's Order, (Dkt. 91), notifying the Court that the court-approved Collective Action Notice and Consent forms were transmitted on

---

[1] The Fifth Circuit adheres to a "rule of orderliness," under which a panel may not overturn a controlling precedent "absent an intervening change in law, such as by a statutory amendment, or the Supreme Court, or our en banc court. Indeed, even if a panel's interpretation of the law appears flawed, the rule of orderliness prevents a subsequent panel from declaring it void." *Sprong v. Fidelity Nat'l Prop. & Cas. Ins. Co.*, 787 F.3d 296, 305 (5th Cir. 2015). For a case to be overruled, it must be "unequivocally" overruled. *United States v. Petras*, 879 F.3d 155, 164 (5th Cir. 2018).

Wednesday, June 14, 2023. (Dkt. 96). Therefore, pursuant to the Court's order, the deadline to opt-in by filing a signed consent was August 14, 2023. (Dkt. 91; Dkt. 96). The Court also held that no later than fifteen days after the close of the notice period all signed consents must be filed with the Court. (Dkt. 91). Accordingly, the statute of limitation for the Named Plaintiffs runs from the date they filed this lawsuit with their consent forms, and the statute of limitation for Opt-in Plaintiffs runs from the date their consent form was filed with the Court.

### 2. Tip Pool Violations

*AM Bussers:* The Court has held that Perry's failed to carry its burden to establish that the AM Bussers "customarily and regularly received tips." (R. & R., Dkt. 179, at 20). Based on the evidence presented at trial, the Court finds that AM Bussers who ended their shifts before 5:00 pm are considered AM Bussers who were not eligible to be part of the tip pool. As discussed above, the evidence demonstrated that AM Bussers who work after 4:00 pm, when the restaurant opens, continued to finish their cleaning tasks and did not adopt customer-facing duties during those closing minutes to the extent that would make their customer interaction more than de minimis. Perry's also did not present evidence to show that the AM Bussers regularly receive tips between 4:00 pm and 5:00 pm while finishing their duties. The Court finds that AM Bussers who continued their duties after the restaurant opened at 4:00 pm, but before 5:00 pm, were not customarily and regularly tipped.

*AM Server Assistants and Food Runners*: The Court finds that Perry's failed to carry its burden to show that employees completing AM Server Assistants and Food Runner shifts, who were working before the restaurant was open and ending their shifts before 5:00 pm, were customarily and regularly tipped and had more than de minimis customer interaction. That is because customers typically were not being served in the restaurant for the AM Server Assistants and Food Runners to

interact with and from whom they could receive tips. Moreover, their duties overlapped with the AM Bussers, as described above.

*AM Hosts:* The Court finds that Perry's did not meet its burden to show that employees working as AM Hosts customarily and regularly received tips and had more than de minimis customer interaction. The AM Hosts worked primarily when the restaurant was closed. Like the other off-hour employees discussed above, the lack of customers in the restaurant before it opens limits the customer interaction AM Hosts could regularly have, and the tips they could regularly receive.

While AM Hosts had some duties which involved contact with customers or potential customers, the Court finds that the customer interaction was, at most, minimal. The interactions AM Hosts had with customers involved calling to confirm reservations, which typically resulted in the AM Host leaving voicemails. (Tr., Vol. I, at 77:23−78:2). As an initial matter, the Court is unconvinced that this qualifies as customer interaction. The *Montano* customer interaction test contemplates customers receiving a service and tipping for that service. By contrast, the AM Hosts were calling *potential* customers about a *future* date of service. In other words, it appears implausible to the Court that someone who made a reservation, but who has yet to walk into Perry's, much less be seated or receive customer service, would have any incentive to leave a tip during an interaction over the phone with a Perry's staff member during which they simply confirm their reservation.

The evidence at trial shows that the calls to potential customers did not engender either customary and regular tipping, or more than de minimis interactions (even considering the calls to potential customers as within the scope of the customer interaction analysis). The entire task of making calls to confirm reservations would take "30 minutes to an hour" of a given three- to four-hour shift according to one witness. (Tr. Vol. I, at 57:10−13). Out of those, about 70 or 80 percent

of calls led to leaving a voicemail, not an interaction, as described above. The customer interaction therefore took a total of a few minutes of a given shift, rendering it not more than de minimis.

Further, the customer interaction was not of a nature that would cause customers to tip regularly and customarily. Trial testimony reflected that customers often expressed irritation at the phone call or would ask to not be called again. (Tr., Vol. I at 78:15−79:1). Perry's representatives testified at trial that the purpose of making these calls was to confirm head counts and ensure the restaurants could properly prepare for the evening. (Tr., Vol. II, at 111:12−18; *see also* Tr., Vol. I, at 237:7-13). Perry's did not present any evidence that potential customers, upon receiving a call to confirm their reservations, would ever (much less regularly and customarily) leave a tip to an AM Host performing the phone call to confirm a booking. The Court finds that these interactions were not the type of customer interactions that evoke tipping generosity. *Cf. Wajcman v. Investment Corporation of Palm Beach*, No. 9:07-CV-80912, 2008 WL 783741, at *4 (S.D. Fla. Mar. 20, 2008) (observing that, "[w]hile the [bouncer's] job might entail significant customer interface, it does not involve the exchange of pleasantries or provision of personal services that ordinarily evokes tipping generosity"); *see also Stewart v. CUS Nashville, LLC*, No. 3:11-CV-342, 2011 WL 2600622, at *3 n.2 (M.D. Tenn. June 29, 2011) ("[T]he court is not convinced that a bouncer who had largely unpleasant, confrontational, or hostile interactions with customers would be eligible for a tip pool.")

*Bartenders*: The bartenders at Perry's were responsible for mixing and serving drinks to provide an enjoyable guest experience. (*See* Defs.' Ex. 20 (Job Description and Duties – Bartender); Defs.' Ex. 69, 70, 74 (Bartender checklists). Bartenders' role involved regularly engaging with guests, who they served directly. (Tr. Vol. II, at 43:1−18). Bartenders typically arrived between 2:30 pm and 3:00 pm. (Tr. Vol. II, at 53:8−10). At trial, the Court did not hear testimony about what duties the Bartenders completed if their shifts started and ended before 5:00 pm. (*See* Pls.' Ex. 371 noting that some bartenders finished their shifts before 5:00 pm). Current Bartender Sara Smith testified about

her duties as a server assistant before opening hours but did not elaborate on what duties she carries out before the restaurant opens while clocked in as a bartender, beyond that she does not prepare drinks. (*See* Tr. Vol. I, at 90:24−95:19). In general, Bartenders received gratuities. (Tr. Vol. II, at 151:7−9). Considering Bartenders' undisputed customer-facing duties, the Court finds that bartenders had more than minimal opportunities for customer interaction and customarily and regularly received tips.

*Service Well*: Rebecca Munns credibly testified that when the Service Well employees paid from the tip pool[2] worked during opening hours, they engaged with guests and took drink orders on a more than de minimis basis, as they were in full view of guests. (*See* Tr. Vol. II at 43:19–44:11). Plaintiffs did not provide rebuttal evidence at trial. The Court finds that, during opening hours, Service Well employees paid from the tip pool were customarily and regularly tipped. However, Perry's did not meet its burden as to AM Service Well employees, when customers were generally not present in the restaurant. By contrast, the evidence presented at trial showed that during those periods when the restaurant was closed, customers only entered the restaurant occasionally to seek a gift card or to retrieve a lost item, which as this Court has found, is not more than minimal customer interaction. As such, the Court finds that the preponderance of evidence shows Service Well employees beginning work after 4:00 pm were customarily and regularly tipped, but when they began and ended their shifts before 5:00 pm, they were not.

*Lunch Parties:* During some AM Shifts, Perry's restaurants would be open for a private lunch event. Perry's indicates in its briefing that most locations held "1 to 3 private lunch parties per month" during the time period covered by this lawsuit. (Defs.' Proposed Findings of Fact, Dkt. 216,

---

[2] Perry's acknowledged that at six of the restaurant locations the Service Well employees worked in a "separate space" that is in the back of the house. (Tr. Vol. II at 44:14−23). However, when Perry's employed Service Well employees in that position, where they worked in a separate space, it paid such Service Well employees a flat hourly rate above the minimum wage and did not include them when distributing proceeds from the tip pool. (*See* Tr. Vol. II, at 44:24–45:8). Plaintiffs did not rebut this assertion.

at 26). To support this assertion, Perry's presented a list of private lunch parties at trial. (Defs.' Ex. 97).[3] As an initial matter, having a private lunch party present and causing the AM Host, Busser, Food Runner, Server Assistant, and Service Well staff above to interact with customers one to three times per month would not necessarily bring any employee to tipped status. The Fifth Circuit held in *Montano* that interacting with customers once per week but spending most of one's time on work not involving customer interaction could be found not to rise to the level of customer interaction enabling inclusion in a tip pool. 800 F.3d at 193−94.

The Court finds that its consideration of the list of private lunch parties does not meaningfully impact the analysis as to the AM employees described above. (*Id*.). The document is a list of lunch parties and when they occurred; it does not indicate who served customers during those lunch parties. Perry's did not offer evidence that the AM employees listed above regularly interacted with customers during lunch parties, during the same shifts in which they completed their busser checklists and cleaning/reservation confirmation duties. The document does not name any instances in which an AM Busser was diverted from their duties described above, nor note what employees staffed lunch parties. The document therefore does not give the Court reason to assume the employees staffed to serve customers were consistently the same group of employees working the AM shifts described above.[4] At trial, Senior Director at Perry's Rebecca Munns testified that on occasion, "[w]e would have someone come in and support the service staff like a food runner." (Tr.

---

[3] The parties dispute whether the information was properly disclosed during discovery, with the parties indicating at trial that the private lunch parties were disclosed in a separate lawsuit but not made part of the record in this case until after the close of discovery. (Tr. Vol. II, at 55:8−56:13). Plaintiffs, citing a 30(b)(6) deposition in a separate lawsuit against Perry's, also argue that the document is not admissible over a hearsay objection because it was not the original record, has been modified, and is therefore not a business record. (Pls.' Proposed Findings of Fact, Dkt. 219, at 39). In light of the liberal construction of the rules of evidence in a bench trial, where the risk of confusing the jury is not present, the Court considers the private lunch party list offered at trial but concludes that it does not meaningfully affect its analysis. (Defs.' Ex. 97).

[4] Indeed, Plaintiffs note that Perry's has testified in another lawsuit that it brought in other employees to work private lunch parties when they occurred. (Pls.' Proposed Findings of Fact, Dkt. 219, at 40).

Vol. II, at 41:15−24). There were times when server assistants could "support a morning party;" this was a job they "could have done." (*Id.* at 42:16−21). Again, however, that testimony does not establish that AM Bussers/Hosts/Server Assistants/Service Wells/Food Runners customarily and regularly carried out customer-facing duties at these events, on a more than a minimal basis, and attained tips while doing so.

To consider the issue as exhaustively as possible, the Court considers, too, the evidence Perry's submitted at the summary judgment phase. Perry's submitted declarations from its corporate leadership mentioning those lunch parties. (Dkt. 165-1; Dkt. 165-2). But they, too, do not help the Court discern whether the private lunch parties caused the AM employees working Busser/Server Assistant/Food Runner/Host/Service Well shifts to have more than minimal customer interaction and to be customarily and regularly tipped. Perry's offered a declaration from its Senior Vice President of Operations, David Freeman, noting that "sometimes, a manager would choose to staff a private lunch event with two AM bussers who would both work together on serving the customers" while also completing the AM Busser checklist, but that "there is no way to tell whether an AM busser worked a private lunch event by looking at the employee's" payroll documentation or other labor reporting. (Dkt. 165-1, at 5).[5] So too, Freeman described that "server(s)" staff those events, along with an "AM Host" on instances where there was a larger event. (*Id.*). In sum, Freeman nowhere indicated how often an AM Busser/Server Assistant/Food Runner/Host/Service Well worked those events—beyond that it sometimes occurred or would occur during a particularly large event. The existence of lunch parties one to three times per month where an AM Busser, AM

---

[5] It is Perry's burden to prove employees' eligibility for the tip pool, as described above. So, if it is not possible to tell from Perry's records which lunch parties had AM employees clocked in as Bussers/Hosts/Server Assistants/Service Wells/Food Runners interacting more than minimally with customers, and customarily and regularly receiving tips for this work, the lack of record keeping on Perry's part does not help resolve this issue in its favor.

Host, or AM Food Runner sometimes worked does not change the fact that Perry's has not met its burden to prove these categories of employees were customarily and regularly tipped.

Perry's declaration from Creighton Hill, a General Manager of three Perry's locations, also does not change the analysis. Hill indicated that at his Perry's locations, an AM Busser, AM Food Runner, or AM Host "might be utilized" for a private lunch event, including when such an event was "larger." (Dkt. 165-2, at 4). Those employees were responsible for performing "regular restaurant set up as well as interacting with the customers and performing direct customer service" during those events. (*Id.*). It is not clear from Hill's declaration how often an AM employee usually focused on restaurant setup might interact with customers because of these events, only that it "might" occur during some of the lunch parties, which happened during a few shifts per month in total. Further, Hill confirms that AM Bussers/Hosts/Food Runners still performed their regular restaurant set up duties. (*Id.*).

Had Perry's offered evidence that AM employees interacted with customers during a portion of their shifts during lunch parties, but still completed their AM Busser checklists and setup duties, this would present a dual jobs scenario and would not change the outcome of this analysis. *See* 29 C.F.R. § 531.56(e). For example, even if Perry's had established evidence that AM Hosts on regular occasions spent a portion of a four-hour AM shift interacting with customers by seating them during a lunch party, (which Perry's did not), such an individual retains their status as a "non-tipped" employee because of their other duties. An employee does not qualify as tipped employee when engaged in "nontipped duties performed during distinct periods of time." *Fast v. Applebee's Int'l, Inc.*, 638 F.3d 872, 880 (8th Cir. 2011); *see also Dole v. Bishop*, 740 F. Supp. 1221, 1228 (S.D. Miss. 1990) ("Because [the] cleaning and food preparation duties [performed for substantial periods of time before the restaurant opened] were not incidental to the waitresses' tipped duties, the waitresses were entitled to the full statutory minimum wage during these periods of time."). Perry's declarations

lead the Court to infer that even if AM Bussers and AM Hosts occasionally served lunch parties, those employees *also* continued in their setup duties, which were not incidental to their work, and would retain their status as non-tipped employees as a result.

In sum, the Court concludes that its consideration of the list of lunch parties and the other record evidence surrounding the staffing of the lunch parties does not change the analysis above and the Court's findings that employees clocked in as AM Bussers, AM Hosts, AM Server Assistants, AM Service Wells, and AM Food Runners were not customarily and regularly tipped.

### 3. Willfulness of Tip Pool Violations

If a plaintiff can demonstrate that a defendant's violation of the FLSA was willful, then the limitations period under the FLSA is extended from two to three years. *See* 29 U.S.C. § 255(a). "An FLSA violation is willful if the employer 'knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute.'" *Mohammadi v. Nwabuisi*, 171 F. Supp. 3d 545, 550 (W.D. Tex. 2016). Plaintiffs bear the burden of establishing a defendant's willfulness. *Ikossi–Anastasiou v. Bd. of Supervisors of La. State Univ.*, 579 F.3d 546, 552 (5th Cir. 2009). In this case, Perry's committed a willful violation of the FLSA when it paid off-hour employees who were primarily performing cleaning and restaurant setup tasks from the tip pool, based on (1) its actual knowledge of FLSA requirements from prior DOL investigations; (2) its actual knowledge of FLSA requirements from prior litigation, as demonstrated at trial; and (3) its receipt of employee complaints.

First, "[i]f an employer has received actual knowledge of FLSA requirements from a prior DOL investigation," it will support a finding of willfulness. *See Solano v. Ali Baba Mediterranean Grill, Inc.*, NO. 3:15-CV-0555-G, 2016 WL 808815, at *5 (N.D. Tex. Mar. 2, 2016). There is no requirement that the prior DOL findings had to address the precise factual issues raised in this case. *See Alvarez v. Amb-Trans Inc.*, No. SA–11–CV–179–XR, 2012 WL 4103876, at *9 (W.D. Tex. Sept.

17, 2012) ("two interactions with the Department of Labor could be sufficient to show that he knew, or at least should have known, what payment policies were required by the FLSA"); *Chao v. A-One Med. Servs., Inc.*, 346 F.3d 908, 919 (9th Cir. 2003) ("we find probative A–One's former FLSA violations, even if they were different in kind from the instant one and not found to be willful. The fact that A–One previously had run-ins with the Labor Department certainly put A–One and Black on notice of other potential FLSA requirements."); *Walsh v. KDE Equine, LLC*, 56 F.4th 409, 416 (6th Cir. 2022) ("An employer having notice of the FLSA requirements by virtue of prior violations and assurances of future compliance is a material fact that we have found to be highly indicative of willfulness.").

Perry's had previously been investigated by the DOL, which determined that it had violated the FLSA by "requiring employees to contribute to an illegal tip pool." (Pls.' Ex. 340; Tr. Vol. I, at 189:20−23). Specifically, the servers were required to share tips with a Private Event Coordinator, which was not a customarily and regularly tipped position. (Pls.' Ex. 340; Tr. Vol. I, at 190:1−7). Based on these DOL findings, Perry's had reason to know that it could not require servers to share tips with employees who did not customarily and regularly receive tips, and this supports this Court's finding that Perry's acted willfully when it required servers to share tips with employees who largely cleaned & prepared the restaurant when it was closed.

Second, while a DOL investigation, without more, could create an inference of willfulness, *e.g., Alvarez*, 2012 WL 4103876, at *9, Perry's has also litigated closely related issues for several years, further supporting an inference of knowledge or reckless disregard for the FLSA's tip pool requirements. In *Steele*, the Fifth Circuit affirmed that Perry's could not claim the tip credit because it did not allow servers to keep all of their tips, instead reducing the tips by imposing "cash delivery" and "credit card processing" fees. *Steele*, 826 F.3d at 244. In *Berger*, the district court held at summary judgment that Perry's was liable under Section 203(m) due to similar credit card offset fees deducted

from the servers' tips. *Berger*, 430 F. Supp. 3d at 408. In *Martinez*, this Court entered summary judgment holding that Perry's violated the FLSA by unlawfully deducting amounts from the plaintiffs' tips for cost of aprons, vests, pepper mills and holders, and crumbers. *Martinez*, 2023 WL 3593167, at *6, *11. That case settled before trial on the issue of whether Defendant's requirements that Plaintiffs give 4.5% of their tips to an illegal tip pool used to pay bussers, food runners, service well bartenders, hosts, and off-hour employees. (*Id.* at *8, *11); *see also Martinez v. Perry's Rests. Ltd.*, No. 1:21-cv-01053-RP (W.D. Tex. May 22, 2023) (Stipulation of Dismissal, Dkt. 109). Given that Perry's has previously been found by courts to have violated the FLSA's tip credit requirements on three prior occasions, Perry's demonstrated either knowledge or reckless disregard for the law when it improperly distributed servers' tips to non-tipped, off-hours employees. *See Perez v. Ocean View Seafood Rest., Inc.*, 217 F. Supp. 3d 868, 880 (D.S.C. 2016) (stating that "prolonged disregard for the FLSA . . . establishes willfulness under the Supreme Court standard") (citing *McLaughlin*, 486 U.S. at 133). This prolonged history of FLSA litigation concerning similar tip credit requirements, and subsequent failure to come into FLSA compliance, shows willfulness on Perry's part.

Third, willful FLSA violations have also been found where an employer "ignored complaints that were brought to its attention." *Zannikos v. Oil Inspections (U.S.A.), Inc.*, 605 F. App'x 349, 360 (5th Cir. 2015); *see also Mohammadi*, 171 F. Supp. 3d at 550 ("[A] violation is willful if an employer knows her pay structure violates the FLSA or ignores complaints brought to her attention.") (citations omitted); *Brooks v. Tire Discounters, Inc.*, No. 3:16-CV-02269, 2018 WL 1243444, at *8 (M.D. Tenn. Mar. 8, 2018) (explaining that courts have found willfulness where there exists evidence that the employer "was placed on notice that its conduct might violate the statute, whether by prior [DOL] investigations, by prior complaints or lawsuits brought by employees, or otherwise"). Here, in addition to receiving "many" questions from servers about the tip pool, (Tr. Vol I, at 245:15−246:8), Perry's received an NLRB complaint about the tip pool distribution. Specifically,

Henderson acknowledged receipt of an NLRB charge stating that an employee asked her general manager questions about the tip pool and expressed "concerns about whether the tip pool was being paid out legally and requested that the company provide us with documentation about the pool and where tips were being paid." (Pls.' Ex. 147-A; Tr. Vol. I at 202:12−203:10 (Henderson testimony)). The complaint did not lead to a change in Perry's tip pool distribution, and Perry's fired the employee who brought the complaint. (Tr. Vol I, at 244:4−25).

Perry's cannot rely on a change in FLSA side work rules about servers to defend against a finding of willfulness. Perry's notes that it changed server duties to limit servers' side work and comply with the thirty-minute rule implemented in 2021. (*See* Tr. Vol. I, at 226:17–226:25). Perry's "re-assigned to bussers all dining room preparation side work previously assigned to servers." (*Id.* at 228:8–228:13). Perry's argued that this "operational change involved shifting dining room preparation side work from servers to bussers (or server assistants) who clocked in before and out before the restaurant was open." (Defs.' Proposed Findings of Fact, Dkt. 216, at 39). However, Perry's efforts to comply with FLSA regulations as to the thirty-minute rule does not excuse it from complying with the FLSA as to the lawfulness of its tip pool classifications. *Montano*'s holding that employees who have minimal or no customer interaction cannot be classified as tipped employees remained in place both before and after the new thirty-minute rule was implemented in 2021. 800 F.3d at 192. In fact, Perry's corporate representative demonstrated familiarity with *Montano* and referenced it at trial, further demonstrating Perry's sophisticated knowledge of the FLSA. (Tr. Vol I, at 199:11−16).

Moreover, the Court observed at trial that Perry's is a sophisticated player regarding the FLSA. The record shows Perry's extensively litigated FLSA issues, has been previously held liable for similar violations, received DOL and employee complaints on related FLSA matters, and

demonstrated familiarity with the relevant statutory and Fifth Circuit provisions in question. These findings show willfulness on the part of Perry's in its conduct violating the FLSA.

### 3. Willfulness of Tip Pool Violations

A court must award a prevailing FLSA plaintiff liquidated damages in an amount equal to actual damages unless the employer is able to demonstrate a good faith basis for believing its wage practices and employee classifications comply with the FLSA. 29 U.S.C. § 216(b); *Dacar v. Saybolt, L.P.*, 914 F.3d 917, 931 (5th Cir. 2018). Perry's burden to prove the reasonableness of its conduct is "substantial." *Dacar*, 914 F.3d at 931. Showing good faith requires showing an "honest intention to ascertain what the [FLSA] requires and to act in accordance with it." *Brantley v. Inspectorate America Corp.*, 821 F. Supp.2d 879, 895 (S.D. Tex. 2011) (quoting *Dybach v. State of Fla. Dep't of Corrections*, 942 F.2d 1562, 1566 (11th Cir. 1991)). "[G]ood faith requires some duty to investigate potential liability under the FLSA." *Id.* (quoting *Barcellona v. Tiffany English Pub., Inc.*, 597 F.2d 464, 469 (5th Cir. 1979)). An employer must "take 'active steps' to ascertain and comply with the FLSA." *Id.* (quoting *Reich v. Southern New England Telecommunications Corp.*, 121 F.3d 58, 71 (2d Cir. 1997)). "The most common means of proving good faith is where an employer proves reliance on the advice of the DOL or the advice of counsel on its classification and wage practices." *Ellis v. Viking Enters., Inc.*, SA-18-CV-00772-ESC, 2019 WL 6271784, at *4 (W.D. Tex. Nov. 22, 2019).

The Court also finds that Perry's has not met its burden to demonstrate a good faith basis for believing its wage practices and employee classifications comply with the FLSA. First, Perry's did not present evidence that it relied on the advice of the DOL about its tip pool classifications. Perry's was aware of the DOL's enforcement authority and had previously been the subject of a DOL investigation in approximately 2004, which found that certain employees could not be included in Perry's tip pool. Even if Perry's has had more recent DOL investigations in 2016 and 2017 which did not reveal tip pool violations, as Defendants argue without citation, (Proposed Findings of Fact,

Dkt. 216, at 38), "at a certain point" a past inquiry with a DOL representative "can no longer save [Perry's] from liquidated damages." *See Berger*, 430 F. Supp. 3d at 409 (awarding liquated damages); *see also Forsythe v. Starboard Yacht Grp., LLC*, 730 F. Supp. 3d 1302, 1311 (S.D. Fla. 2024) (finding lack of good-faith and willfulness where "[d]espite claiming it engages in ongoing efforts, [d]efendants offer[ed] just one example" from an audit several years earlier "of its ongoing effort.").

Second, Perry's did not represent at trial that it relied on advice of counsel in creating its current tip pool classifications. (Tr. Vol. I, at 200:2−12; Tr. Vol. I, at 201:8−202:2). The lawsuits described above did not lead Perry's to seek legal advice and adjust its tip pool to exclude these off-hour employes. (Tr. Vol. I, at 193:21−194:13 (Henderson testifying that he did not recall any changes based on legal advice since the *Shaffer* case); Tr. Vol. I at 194:9−13 (Henderson testifying he did not recall any changes to the tip pool based on legal advice after the *Berger* case)). Perry's also did not recall seeking legal advice when adding AM Hosts to the tip pool, despite these employees working entirely before the restaurant opened. (*See* Tr. Vol. I, at 200:2−20; Tr. Vol. I at 201:8−202:2). Especially given that Perry's should have been put on notice by its prior FLSA litigation, the failure to seek to conform the tip pool at issue to the FLSA tip pool requirements supports a finding of a lack of good faith. In sum, as described above, Perry's attempts to comply with the FLSA in one area (the thirty-minute side work rule) does not excuse failure to comply with the FLSA's tip pool requirements. The Court finds that Perry's has not demonstrated a good faith basis for believing its classifications comply with the FLSA.

### 4. Christopher Perry's Employer Status

Under the FLSA's definition, Christopher Perry qualifies as an "employer." The definition of "employer" under the FLSA is "'expansive,' extending liability to persons with 'managerial responsibilities' and 'substantial control of the terms and conditions of the [employee's] work.'" *Mohammadi v. Nwabuisi*, No. SA:12-CV-00042-DAE, 2013 WL 1966746, at *12 (W.D. Tex. May 10,

2013) (quoting *Donovan v. Grim Hotel Co.*, 747 F.2d 966, 971 (5th Cir. 1984)) (overruled on other grounds, *Mohammadi v. Nwabuisi*, 605 F. App'x 329, 330 (5th Cir. 2015)). "[T]he FLSA 'imposes liability on the individual officer . . . because that individual has 'substantial control of the terms and conditions of the [employee's] work' or 'operational control,' or 'effectively dominates its administration or otherwise acts, or has the power to act, on behalf of the corporation vis-a-vis its employees.'" *Kennedy v. Turbo Drill Indus.*, No. MO:20-CV-00251-DC-RCG, 2021 WL 5261707, at *11 (W.D. Tex. July 2, 2021) (citation omitted). "'The overwhelming weight of authority is that a corporate officer with operational control of a corporation's covered enterprise is an employer along with the corporation, jointly and severally liable under the FLSA for unpaid wages.'" *Mohammadi*, at *33 (quoting *Donovan*, 747 F.2d at 972); *Rojo v. Burger One LLC*, No. 3:11-cv-2968-BN, 2024 WL 991585, at *9 (N.D. Tex. Mar. 6, 2024) (citations omitted). "[C]orporate officers with significant ownership interests, day-to-day control of operations, and involvement in the supervision and payment of employees can be personally liable for the corporation's failure to pay owed wages." *Solis v. Int'l Detective & Protective Serv., Ltd.*, 819 F. Supp. 2d 740, 748 (N.D. Ill. 2011) (citations omitted).

As discussed above, the evidence at trial showed Mr. Perry is involved in personnel decisions, staffing decisions, and was involved in setting the tip share rate of 4.5%. He calls the restaurant locations and gives staff feedback on their responsiveness to phone calls. He also sets policy concerning numerous aspects of the restaurants' operations and has several employees reporting to him. Given that Mr. Perry has ownership interests, day-to-day control of operations, and involvement in the oversight, management, and payment of employees, the Court finds that he is an employer jointly and severally liable under the FLSA for tip pool violations.

### 4. Damages

Plaintiffs are entitled to minimum wage and reimbursement of all tips contributed to the unlawful tip pool for each week in which there was a violation. "If a tip pooling arrangement

violates the FLSA's requirements, the employer is ineligible to claim the tip credit, is liable for the difference between its tipped employees' sub-minimum direct cash wage ($2.13) and the federal minimum wage ($7.25), and must reimburse all improperly retained/distributed tips." *Lockett v. Pinnacle Ent., Inc.*, No. 19-00358-CV-W-GAF, 2021 WL 960424, at *5 (W.D. Mo. Mar. 12, 2021).

With regard to minimum wage damages, Perry's paid Plaintiffs a subminimum direct cash wage of $2.13 (less than $7.25 per hour) and invoked the "tip credit" to satisfy their minimum wage obligations. Plaintiffs are entitled to recover all tips contributed to an unlawful tip pool. Under the FLSA, "[a]n employer may not keep tips received by its employees for any purposes … regardless of whether or not the employer takes a tip credit." 29 U.S.C. § 203(m)(2)(B).  "Any employer who violates Section 203(m)(2)(B) . . . shall be liable to the employee or employees affected in the amount of the sum of any tip credit taken by the employer and all such tips unlawfully kept by the employer, and in an additional equal amount as liquidated damages." 29 U.S.C. § 216(b). When employees are forced to participate in an unlawful "tip pool," they effectively subsidize the restaurant's labor costs, and thus the tips contributed to the pool have been unlawfully "retained" by the defendant and are recoverable. *See Ehde v. RPM Dining, LLC*, 2023 WL 11915730, at *5 (W.D. Tex. June 22, 2023).

Perry's has argued that § 216(b) only permits recovery of tips unlawfully "kept" by the employer, and that because Perry's purported to use the tips to pay ineligible employees, it did not "keep" the tips for itself. This argument runs afoul of the plain text of the statute. The statute prohibits the employer from "keep[ing] tips received by its employees *for any purposes*," which includes tips that were kept for the purpose of subsidizing the restaurant's labor costs by distributing the tips to ineligible employees. 29 U.S.C. § 203(m)(2)(B) (emphasis added). In other words, an employer cannot violate the FLSA but avoid liability simply because it diverted the funds to a third party or used the funds to pay rent, cover restaurant expenses, or compensate other employees. The statute covers tips that have been "kept" but used by the restaurant to cover costs.

Given that the Court has found that Perry's distributed tip pool funds to ineligible employees who did not customarily and regularly receive tips, the Court finds that Plaintiffs should receive the difference between their subminimum hourly wage and the full statutory minimum wage of $7.25 for all hours in a workweek in which there was a tip pool violation. Perry's operated a tip pool on a weekly basis. (Tr., Vol. I, at 246:13−19). In other words, Perry's required servers to contribute 4.5% of all sales in each week to the pool, which was then distributed to all individuals who worked under certain job codes during that same week. Because the tip pool was collected and distributed on a weekly basis, a portion of Plaintiffs' weekly tips were used to subsidize the wages of employees working at other times during the week. Thus, in any workweek in which Perry's weekly tip pool was unlawful, Perry's is divested of the tip credit for that week, and Plaintiffs are entitled to recover damages on a weekly basis.

The Court will give the parties the opportunity to correct the damages calculations proposed during trial before awarding a final damages judgment. Plaintiffs are instructed to omit from their damages calculations shifts worked by Bartenders as described above. Further, Plaintiffs did not prove that any PM employees were not lawfully included in the tip pool, so those shifts must be excluded as well. Also, if there are weeks, such as during the COVID-19 pandemic, during which Plaintiffs received the full minimum wage instead of the $2.13 subminimum wage, the Court expects that Plaintiff will correct the damages calculations to omit those weeks or otherwise address this issue in their filings. For any remaining issues as to the duplicate counting of individual employees, erroneous inclusion of Opt-In Plaintiffs who have settled or dismissed their claims, or damages based on shifts where an employee erroneously "clocked out" long after the restaurant was already closed, the Court expects that Plaintiffs correct any error in their proposed damages calculation or address these issues in their briefing on damages.

## IV. CONCLUSION

Based on these findings of fact and conclusions of law, the Court finds that Plaintiffs proved their FLSA claim at trial. A final judgment will be entered separately.

**IT IS ORDERED** that Plaintiffs file a Motion to Enter Damages Calculations in accordance with this Order, attaching a proposed damages calculation order in accordance with this Order, on or before **December 2, 2025**. Defendants may file a response on or before **December 16, 2025**, and any reply will be due **December 23, 2025**. The parties are instructed to only address any issues related to calculation of damages to Plaintiffs in accordance with the analysis of this Court's Order; the briefing on damages cannot be used to request reconsideration of this Order.

**IT IS ORDERED** that Defendants' motion in limine, (Dkt. 182), is **DENIED IN PART.** For the reasons explained on the record, the Court permitted Plaintiffs' witness Muskan Garg to testify and for Defendant to present a rebuttal witness, Shane Grahn. (Text order dated March 31, 2025). Defendants' motion in limine, (Dkt. 182), is otherwise **MOOT.**

**IT IS FURTHER ORDERED** that because the Court need not enter a partial judgment and will instead enter a final judgment adjudicating all claims in this case, the Court finds that the parties' Motions for Entry of Proposed Partial Judgment addressing the Court's order on summary judgment, (Defs.' Motion, Dkt. 197; Pls.' Motion, Dkt. 198), are **MOOT.**

**SIGNED** on November 10, 2025.

_____

ROBERT PITMAN
UNITED STATES DISTRICT JUDGE