IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| CANDICE PASCHAL and PEDRO ZARAZUA, JR., et al. | § § § | |
| Plaintiffs, | § § | |
| v. | § § | NO. 1:22-CV-00027-RP |
| PERRY'S RESTAURANTS LTD d/b/a PERRY'S STEAKHOUSE AND GRILLE and CHRISTOPHER V. PERRY, Individually, | § § § § § | |
| Defendants. | § § | |

**DEFENDANTS' MOTION UNDER RULES 52 AND 59 TO AMEND OR ADD FINDINGS AND CONCLUSIONS AND/OR TO ALTER OR AMEND THE JUDGMENT, OR ALTERNATIVELY FOR NEW TRIAL**

Defendants Perry's Restaurants Ltd. and Christopher V. Perry move under Federal Rules of Civil Procedure 52(a), 52(b), 59(a)(1)(B), 59(a)(2), and 59(e) to amend the Court's Findings of Fact and Conclusions of Law (Dkt. 227), to make new or additional findings and conclusions, and/or to alter or amend the judgment, and alternatively for a new trial.

## Introduction

Defendants' position is that there is no final and appealable judgment. Federal Rule of Civil Procedure 58 requires a separate judgment, which has not been entered, and the damages issues remaining are subject to more than a mechanical calculation, which the parties are briefing. But out of an abundance of caution—due to some uncertainty, the possibility of Plaintiffs arguing that a final judgment exists arising out of the Findings of Fact and Conclusions of Law ("FF/CL"), and the significant consequences of untimely motions under Rules 52 and 59 or untimely notices of appeal—Defendants Perry's and Mr. Perry are prematurely filing this Motion requesting relief under Rules 52 and 59. Defendants will also file a premature notice of appeal. Defendants will amend both this Motion and that notice of appeal once the Court finally resolves all issues and enters a judgment consistent with Rule 58.

Parts I, II, and III of this Motion primarily challenge three rulings that are legally and factually unsupported: (1) the order requiring Defendants to return "all tips" contributed to the tip pool; (2) the findings of willfulness and lack of good faith; and (3) the determination that Mr. Perry qualifies as an "employer" under the FLSA. Part IV then recites, for purposes of preservation on appeal, other errors that the Court should reconsider.

## Legal Standard

Federal Rules of Civil Procedure 52(b), 59(a)(2), and 59(e) permit the Court to amend or add to its findings of fact and conclusions of law, and to amend a judgment, to correct manifest errors of law or fact. *See, e.g.*, *Schiller v. Physicians Resource Grp.*, 342 F.3d 563, 567 (5th Cir. 2003); *Fontenot v. Mesa Petroleum Co.*, 791 F.2d 1207, 1219 (5th Cir. 1986). The Court also may grant a new trial. Fed. R. Civ. P. 59(a)(1)(B) & 59(a)(2).

**Argument**

I.   **The ruling requiring disgorgement of "all tips" was not certified for collective action, exceeds the scope of § 216(b), and conflicts with the statute's text, structure, and purpose.**

    A.   **Ordering Defendants to return tips it did not keep, but instead gave to other non-managerial workers, ignores Department of Labor guidance on non-traditional tip pools, is contrary to the statute's text, and awards a windfall double recovery precluded by the statute and Congress's scheme.**

The Court's FF/CLs ordering that Plaintiffs can recover not only minimum wage but also "reimbursement of all tips contributed" to the tip pool, on the theory that Defendants "kept" the tips, Dkt. 227 at 30-31, is manifest error. It effectively ignores that Defendants can operate a non-traditional tip pool that allows non-customarily tipped employees into the tip pool if Defendants pay everyone a minimum wage. In ignoring that, this FF/CL awards a double recovery contrary to the statutory scheme that allows such a tip pool, specifically ignores the tip pool provision in the § 216(b)'s remedy section, and upends the balance struck on punitive versus liquidated damages.

The Department of Labor expressly permits employers to make distributions to "employees in the establishment who are not employed in an occupation in which employees customarily and regularly receive tips." 29 C.F.R. § 531.54(d). If the non-traditional tip pool does include such employees, the employer may not pay a sub-minimum wage subsidized by a tip credit under 29 U.S.C. § 203(m)(2)(A), but must pay the standard minimum wage. *See id.* If the employer fails to do so, it will "be liable to the employee or employees affected in the amount of their unpaid minimum wages . . . and in an additional equal amount as liquidated damages." 29 U.S.C. § 216(b). As explained in a Department of Labor Fact Sheet: "When an employer pays its employees a cash wage of at least the federal minimum wage (currently $7.25) per hour, the employer may impose a mandatory tip pooling arrangement that includes employees who are not employed in an occupation in which employees customarily and regularly receive tips."[1]

That is borne out in the text of the statute. Damages under the FLSA are codified at 29 U.S.C. § 216(b), which, in relevant part, reads as follows:

---

[1] U.S. Dep't of Labor, Wage and Hour Div., Fact Sheet #15: Tipped Employees under the FLSA, https://www.dol.gov/agencies/whd/fact-sheets/15-tipped-employees-flsa (last accessed Dec. 4, 2025).

An employer who violates the provisions of section 206 or section 207 of this title shall be liable to the employee or employees affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, and in an additional equal amount as liquidated damages . . . . Any employer who violates section 203(m)(2)(B) of this title shall be liable to the employee or employees affected in the amount of the sum of any tip credit taken by the employer and all such tips unlawfully kept by the employer, and in an additional equal amount as liquidated damages. . . .

The beginning of this provision calls out entire sections of the title, *see id.* (citing 29 U.S.C. § 206 (minimum wage requirement)). But for tips, it only specifies one subparagraph, § 203(m)(2)(B), which was added as part of the 2018 Consolidated Appropriations Act (CAA). *See* Pub. Law 115-141, Div. S, Tit. XII, § 1201, 132 Stat. 348, 1148–49 (2019). In enacting the CAA, Congress did not reference the tip credit provision, which is codified at 29 U.S.C. § 203(m)(2)(A), indicating that Congress did not intend that a violation of § 203(m)(2)(A) would include the recovery of tips distributed to other employees as part of a tip pooling policy.

The CAA's amendments to the FLSA reversed previous Department of Labor regulations that prohibited employers from including otherwise ineligible tip pool recipients (e.g., cooks and dishwashers) among those who could receive tip pool funds. *See* 85 Fed. Reg. 8756, 86765–66 (Dec. 30, 2020). In short, there is *nothing unlawful* about making distributions to people outside of a tipped occupation (unless they are supervisors, managers, or owners) if the employer is not claiming the tip credit. If the employer improperly claims a tip credit, the employer is liable for payment of minimum wage, *not* return of tips distributed to people who are not in tipped occupations. Even if §216(b) applied, the relief available under § 216(b) for a violation of § 203(m)(2)(B) is limited to tips an employer "keeps." That remedy does not apply because Congress could have made the remedy available when an employer "keeps" the tips (as explained in § 203(m)(2)(A) (the tip credit provision)), but it did not. But in any event, the Court found that the company did not retain any portion of the pool, and that managers and supervisors did not share in the pool. Rather, the entire weekly pool was distributed to hourly non-managerial staff. Dkt. 227, at 32; *see also* Tr. Day 2 at 163:6–15. That is not keeping the tips under the FLSA.

In rejecting this argument, the FF/CL (Dkt. 227 at 31) lumps together violations for paying managers, restaurant expenses, rent, etc.—impermissible uses of tips—with what is expressly

permitted by the statute as clarified by Department of Labor regulation—operating a non-traditional tip pool. 29 C.F.R. § 531.54(d). That demonstrates the misapplication of the text. The misreading is also confirmed by the Court's emphasis on "for any purposes" rather than the word "keeps." *See* Dkt. 227 at 31. It's not that Defendants *keep* the tips to "pay fees to management and DJs," *Ehde v. RPM Dining, LLC*, No. 1:22-CV-00870-RP, 2023 WL 11915730, at *5 (W.D. Tex. June 22, 2023) (cited by Dkt. 227 at 31), or the cost of laundering aprons, *Ettorre v. Russos Westheimer, Inc.*, No. 21-20344, 2022 WL 822181, at *3 (5th Cir. Mar. 18, 2022).

In short, under the Court's logic that Perry's included employees not customarily tipped in the tip pool, the only violation is wrongfully paying its workers the tip-credit minimum wage under § 203(m)(2)(A)—that is, not paying minimum wage for a non-traditional tip pool—rather than a violation of keeping the tips under § 203(m)(2)(B). *See, e.g.*, Dkt. 227 at 12-13 (citing 29 U.S.C. § 203(m)(2)(A), *Restaurant Law Ctr v. United States Dep't of Labor*, 120 F.4th 163, 166 (5th Cir. 2024), and *Pedigo v. Austin Rumba, Inc.*, 722 F.Supp.2d 714, 721 (W.D. Tex. 2010)). Indeed, in previous litigation, Magistrate Judge Hightower explained that "Plaintiffs conflate the tip credit defense with their uniform and equipment claim," which are analytically separate issues. *Martinez v. Perry's Restaurants Ltd*, No. 1:21-CV-01053-RP, 2023 WL 3593167, at *3 (W.D. Tex. May 22, 2023), *report and recommendation adopted*, No. 1:21-CV-1053-RP, 2024 WL 23181 (W.D. Tex. Jan. 2, 2024), *modified on clarification,* No. 1:21-CV-01053-RP, 2024 WL 1235591 (W.D. Tex. Feb. 13, 2024). She then highlights Fifth Circuit and Texas federal district court precedent that show "other courts that have separated these inquiries." *Id.* (collecting cases).

Awarding tip disgorgement, in addition to awarding minimum wage, results in an unlawful and improper double recovery to Plaintiffs. It also amounts to "punitive damages" beyond the scope of the liquidated damages allowed under the FLSA. This is error. *See Diaz v. Castro*, 122 F. Supp. 3d 603, 617 (S.D. Tex. 2014) ("Punitive damages are not available under the FLSA in excess of permitted liquidated damages."). The FLSA's liquidated damages provision already operates as punitive damages (except, potentially, in FLSA retaliation cases). *See, e.g.*, *Little v. Technical Specialty Products, LLC*, 940 F. Supp.2d 460, 479 (E.D. Tex. 2013) (discussing that FLSA

liquidated damages are a form of punishment and refusing to award additional punitive damages). Further awarding repayment of each Plaintiff server's tips paid to a tip share for an entire workweek when there is no finding any "PM" support staff employee unlawfully received those tip share funds—and Plaintiffs received the benefit of those "PM" employees to support customer service and earn those very tips—would be tantamount to a punitive penalty on top of another punitive penalty of liquidated damages.

### B. The Court's weekly-aggregation rationale is manifest error and cannot expand liability beyond what § 216(b) authorizes.

The FF/CL reasons that because tip pools were accounted for on a weekly basis, any weekly inclusion of ineligible recipients divested the tip credit for that week and justified returning all tips contributed that week. That approach conflates (i) the distinct "tip credit" condition in § 203(m)(2)(A)—which affects entitlement to the $5.12 differential—with (ii) the separate tip-keeping prohibition in § 203(m)(2)(B)—which triggers disgorgement only when the employer keep tips "for any purposes." And weekly aggregation is a payroll mechanism, not a liability multiplier that transforms lawfully distributed funds into "tips kept by the employer." The remedy for a § 203(m)(2)(A) failure is to pay the minimum wage differential for the affected period. There was no finding that any busser, host, food runner, server assistant, service well bartender, or bartender who worked primarily after the restaurants opened at 4:00p.m. was an invalid tip pool recipient, and significant share[2] of Plaintiffs' tip share funds were distributed to those "PM" support staff employees—not to the so-called "AM employees." Disgorgement of the entire pool therefore far exceeds the statutory boundaries of recovery in this case, requiring a separate, textual predicate that is not present here.

For this additional reason, the Court should amend its conclusions and judgment to limit damages to the statutory minimum wage differential for any week in which the tip credit is divested, if any, and correspondingly should vacate the award disgorging "all tips" under § 216(b).

---

[2] This will be shown in the Defendants' forthcoming brief on damages.

### C. The issue of whether Defendants "unlawfully kept" tips was not certified for resolution at trial.

Yet another reason the FF/CL's tip pool ruling is manifest error is that the issue was not certified for trial. Certification is a "gatekeeping framework for assessing, at the outset of litigation, *before* notice is sent to potential opt-ins, whether putative plaintiffs are similarly situated." *Swales v. KLLM Transport Services, L.L.C.* 985 F.3d 430, 433 (5th Cir. 2021). *Swales* did away with conditional certification in FLSA cases, which allowed courts to proceed on claims then certify later. *Id.* at 436. After *Swales*, "a district court must rigorously scrutinize the realm of 'similarly situated' workers, and must do so from the outset of the case, not after a lenient, step-one 'conditional certification.'" *Id.* at 434.

That's exactly what this Court did. In April 2023, Judge Hightower entered a R&R regarding *Plaintiffs' Motion for Court-Authorized Notice* (Dkt. 50). *See* Dkt. 78. Judge Hightower found there "that Plaintiffs have not shown" a policy "that Defendants 'retained portions of Plaintiffs' and Collective Members tips.'" Dkt. 78 at 8 (quoting Dkt. 1, ¶ 34). Judge Hightower further found that "Plaintiffs offer[ed] no evidence that Defendants retained or otherwise failed to distribute tip pool funds," and recommended "against permitting Plaintiffs to pursue this claim collectively." Dkt. 78 at 8. This Court adopted Judge Hightower's R&R as its opinion on May 16, 2023. *See* Dkt. 87. There is thus no collective action allowed in this case as to whether "Defendants retained or otherwise failed to distribute tip pool funds." Dkt. 78 at 8; Dkt. 87.

The Fifth Circuit has held: "The law-of-the-case doctrine posits that when a court decides upon a rule of law, that decision should continue to govern the same issue in subsequent stages in the same case." *June Med. Servs., L.L.C. v. Phillips*, 22 F.4th 512, 519 (5th Cir. 2022) (quotes omitted). This Court already held that there was no evidence Defendants retained tip pool funds and rejected certifying the collective action as to this claim, and that ruling should be law-of-the-case. *See* Dkt. 78 at 8; Dkt. 87. Nor can the Court revert back on the issue through a certify-later approach, which was resoundingly rejected by the Fifth Circuit in *Swales*, 985 F.3d at 436. This procedural reason is yet another reason this Court should not find that Defendants kept the tips on a collective action basis.

## II.    The record does not support a finding of willfulness under the correct standard, which this Court failed to apply, while Defendants also established good faith.

The FF/CL's willfulness and good-faith determinations are also manifestly erroneous. Defendants are challenging both. While willfulness allows Plaintiffs extend the limitations period and good faith is an affirmative defense to liquidated damages, the arguments below apply to both.

Willfulness requires Plaintiffs to prove that Defendants knew their conduct was prohibited or acted with reckless disregard as to whether it was. It is not enough "that an employer knew that FLSA 'was in the picture[.]'" *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 134–35 (1988). An employer that "act[s] without a reasonable basis for believing that it was complying with the [FLSA]" is merely negligent. *McLaughlin,* 486 U.S. at 134–35; *see also Mohammadi v. Nwabuisi*, 605 F. App'x 329, 332 (5th Cir. 2015). "Simply failing to seek legal advice concerning its pay practice does not evidence a willful violation of the statute." *Mireles v. Frio Foods, Inc.*, 899 F.2d 1407, 1416 (5th Cir. 1990); *see also Nwabuisi*, 605 F. App'x at 332. "[E]mployers act willfully when they know their pay structures violate the FLSA or ignore complaints brought to their attention." *Id.*[3]

For the good faith affirmative defense, "to be relieved of liability for liquidated damages, an employer must demonstrate *both* good faith *and* reasonable grounds for believing that it was not violating the Act." *LeCompte v. Chrysler Credit Corp.,* 780 F.2d 1260, 1263 (5th Cir. 1986).

First, Dfendants certainly had a good-faith argument that *Restaurant Law Center* and changing underlying regulations upended *Montano*'s customer interaction test, such that the test no longer applied, and instead a customer service function test applied. 85 Fed. Reg 86756-01 (Dec. 30, 2020) (removing the underlying language relied upon in *Montano*); *see also Restaurant Law Center*, 115 F.4th at 409 (criticizing "temporality" aspect of Department of Labor regulations

---

[3] *See also, e.g.*, *Singer v. City of Waco*, 324 F.3d 813, 821–22 (5th Cir.2003) (upholding a jury finding of willfulness where the employer admitted that it knew its employees were being paid incorrectly and the employer's attorney advised the employer not to investigate); *Reich v. Bay, Inc.,* 23 F.3d 110, 117 (5th Cir.1994) (upholding a district court's finding of willfulness where the employer was notified by a government representative that its payment practices violated the FLSA and the employer continued those practices without further investigation).

that are also in *Montano*); Dkt. 164 at 17-19 (Summary Judgment Response explaining why *Montano* no longer applies). That good-faith argument about *Montano* being overruled shows both that Defendants did not act willfully and had a reasonable basis for its position—the latter not even required to avoid willfulness, *Mireles*, 899 F.2d at 1416. Even if Defendants' position were a negligent misreading, it would not be willful. *See id*. That reasonable basis does apply to Defendants' good-faith defense. And this Court should find Defendants' position on *Restaurant Law* and the changing Department of Labor regulations was a reasonable position taken in good-faith that meets their burden on the good-faith affirmative defense. *See Mireles*, 899 F.2d at 1415.

Relatedly, the Court is also wrong to fault Defendants for pointing out that it made changes to comply with the side work rule. Dkt. 227 at 29. But Defendants pointed that out to show that it is merely trying to keep up with the typical pattern that "another change in presidential administration swept in another change in DOL policy," *Rest. L. Ctr. v. United States Dep't of Lab.*, 120 F.4th 163, 167 (5th Cir. 2024), a policy that Perry's would need to juggle in its good faith attempts to avoid violating the FLSA. Perry's prevailed on the claims about the side work rule in this case. Dkt. 176; Dkt. 180.

Defendants also had good-faith arguments supporting its position that its tip pool *complied* with *Montano*. *See Montano v. Montrose Rest. Assocs., Inc.*, 800 F.3d 186, 194 (5th Cir. 2015) ("Critically, there is a genuine issue of fact about whether the coffeeman had *any* interaction with the diners who left the tips.") (emphasis original). *Montano*, like Perry's approach, focuses on the *amount* of interaction. It's not just Perry's that has read *Montano* this way, as Judge Dennis's *Montano* concurrence in the judgment faulted the majority for focusing on "the amount of customer interaction" as being correlated to "the likelihood of a tip." 800 F.3d at 195–96 (Dennis, J., concurring). Even if Judge Dennis and this Court were right that the amount of customer interaction is the wrong test, *see, e.g.*, Dkt. 227 at 19 (citing *Wajcman* case like Judge Dennis), Judge Dennis's views did not carry the day and is "contrary to the majority's assumption." 800 F.3d at 196 (Dennis, J., concurring). In other words, Defendants had a reasonable basis, following a binding *majority* opinion, to believe that if its AM workers had "*any* interaction" with customers

during the work week—under *Montano*'s facts "carrying trays to a dining room about once per week"—then that could be sufficient customer interaction to justify the characterization that these individuals were customarily and regularly tipped. 800 F.3d at 194. That's far more than "acting without a reasonable basis for believing that it was complying with the [FLSA]," which is merely negligent and insufficient to support a willfulness finding to extend the limitations period. *McLaughlin,* 486 U.S. at 134–35; *Nwabuisi*, 605 F. App'x at 332. Rather, relying on the majority view of *Montano* is a reasonable basis, and enough to support a good-faith defense, such that this Court should decline to apply liquidated damages. *See Mireles*, 899 F.2d at 1415.

Perry's previous FLSA litigation does not change that reasonable basis or show knowledge or recklessness to support a willfulness finding. This Court faulted Perry's for not updating its policies after *Berger* and *Shaffer*. FF/CL at 10, 25-26.  But in *Berger*, Perry's *prevailed* on the relevant tip pool claim. "[B]ecause [Perry's] did not keep any portion of the tip pool, the Court grants Defendants summary judgment on Plaintiffs' tip pool claim." *Berger v. Perry's Steakhouse of Illinois, LLC*, 430 F. Supp. 3d 397, 419 (N.D. Ill. 2019); *see also* Tr. Day 1, at 194. Likewise in *Shaffer*, the "claims . . . involve[d] a tip pool and side work," and Perry's was "victorious on all the claims." Day 1, Tr. at 213:17-214:1; *see also Shaffer v. Perry's Restaurants, Ltd.*, No. SA-16-CV-01193-FB, 2019 WL 2117639, at *4 (W.D. Tex. Apr. 3, 2019), report and recommendation adopted, No. CV SA-16-CA-1193-FB, 2019 WL 2098116 (W.D. Tex. Apr. 24, 2019) ("The Court should therefore grant Perry's motion for summary judgment and dismiss the sole remaining claims in this lawsuit with prejudice."). In fact, *Shaffer* even endorsed the approach by Perry's to focus on job tasks on the O*NET resource based on DOL regulations, and whether performed customer service functions. *See id.* at *5 ("These DOL communications provide this Court with clear guidance as to the DOL's most updated interpretation of the dual-jobs regulation, which shifts the inquiry to whether the non-tipped duties performed by a server are related to and preformed contemporaneously with the tipped duties, such as the tasks set forth in O*NET.").  For similar reasons, the previous DOL investigations do not put Defendants on notice about this alleged tip pool violation because the investigations were not about the tip pool, and Defendants were cleared

by the February 2017 investigation finding no violations, and the November 2016 investigation only found one violation for mailing an employee's final paycheck to the wrong address.

Further, the "many" questions about the tip pool cannot support a willfulness finding or negate Defendants' evidence of a good-faith defense. As the testimony that the Court relies upon explains, the questions were about Perry's making up any shortage to make sure employees are well-compensated, and ensuring its workers understand what they're "going to make." *See* Day 1, Tr. at 246:5-23. That is not questions about whether any of the servers should be properly included in the tip pool—the relevant question here. Nor does the NLRB charge or related testimony suffice as evidence of any particular potential violation. That testimony, therefore, is no evidence of willfulness nor can it undermine Defendants' good-faith defense.

In general, the FF/CL relies on *Chao v. A-One Med. Servs., Inc.*, 346 F.3d 908, 919 (9th Cir. 2003), and district court cases citing *Chao*, to contend that *any* FLSA violation puts Perry's on notice that *all* its FLSA conduct could be unlawful. Dkt. 227 at 25. That position contradicts controlling Supreme Court and Fifth Circuit precedent. As the Fifth Circuit explained, "a negligent violation of the statute is [not] a willful violation," and "even though an employer may act unreasonably, . . . its actions do not necessarily constitute a willful violation." *Mireles*, 899 F.3d at 1416 (citing *McLaughlin*, 486 U.S. at 1682, 1682 n.13). The Court faulted Perry's corporate representative at trial for "demonstrat[ing] familiarity with *Montano* and referenced it at trial, further demonstrating Perry's sophisticated knowledge of the FLSA," Dkt. 227 at 27, but that is only evidence that Defendants attempted to comply and that "an employer knew that FLSA 'was in the picture[,]'" none of which is enough to show willfulness. *McLaughlin* 486 U.S. at 134–35. That's setting aside the most reasonable inference that Perry's corporate representative learned about *Montano* through this case.

This FF/CL also faults Defendants for not seeking advice of counsel in its good-faith defense. *See* Dkt. 227 at 29. That is unsupported by the record and should be amended under Rule 52(b). Defendants generally *have* sought legal advice about its tip pool, Tr., Day 1, at 193:17–20, even if not recalling specific incidents related to other cases. *See generally* Tr., Day 1, at 194.

### III.    The employer finding as to Mr. Perry is contrary to the Fifth Circuit's economic-reality test and the trial record.

The FF/CL's determination that Mr. Perry qualifies as an "employer" is also manifest error. The FLSA's "employer" definition is not boundless. Under the Fifth Circuit's economic-realities test, relevant factors include whether the individual: (1) had the power to hire and fire employees; (2) supervised and controlled work schedules or conditions of employment; (3) determined the rate and method of payment; and (4) maintained employment records. *See Gray v. Powers*, 673 F.3d 352, 355 (5th Cir. 2012). No single factor is dispositive, and "a party need not establish each element in every case." *Orozco v. Plackis*, 757 F.3d 445, 448 (5th Cir. 2014). The Fifth Circuit has made clear "merely being an officer or shareholder does not subject an individual to FLSA liability." *Gray*, 673 at 355–56. Rather, the question is operational control of the employees themselves—not their supervisors. *See id.*; *see also Heath v. TFS Dining, LLC*, No. A-20-CV-00890-RP, 2022 WL 827654, at *5 (W.D. Tex. Mar. 18, 2022), *report and recommendation adopted,* No. 1:20-CV-890-RP, 2022 WL 1793533 (W.D. Tex. May 3, 2022) ("managers did not consult [alleged employer] regarding the hiring of entertainers at the club.").

This Court's FF/CL erroneously does not apply *Gray*'s four-factor analysis, which alone is legal error. The FF/CL cites *Mohammadi v. Nwabuisi*, which, while not citing *Gray*, did apply an economic-realities test. *See* Dkt. 227 at 29 (citing *Mohammadi v. Nwabuisi*, No. SA:12-cv-00042-DAE, 2013 WL 1966746, at *12 (W.D. Tex. May 10, 2013)). In *Nwabuisi*, employers "interviewed, hired, and fired Plaintiff," "directly oversaw Plaintiff's work," "authorized deductions from payroll by deciding whom should receive a loan or wage advance," "participated in the creation of Defendants' system of compensation," and "had direct control over Defendants' compliance with the FLSA." *See Mohammadi*, 2013 WL 1966746, at *12–13.

This Court, however, did not make similar findings for the economic-reality factors. For example, regarding *Gray* factor (1), hiring and firing employees, the FF/CL concludes that "Mr. Perry is involved in personnel decisions, staffing decisions, . . . and involvement in the oversight, management, and payment of employees[.]" Dkt. 227 at 30. But the Court's factual findings are

that those decisions were limited to "managerial and senior level positions," because Mr. Perry "has also been involved in the hiring and promotion of upper-level management." Dkt. 227 at 4. The FF/CL makes no findings about Mr. Perry's exercise of authority to hire or fire bussers, food runners, or the hosts at issue—nor would any such finding be supported by any evidence. The only evidence for factor (1) is that the CEO had power to hire and fire *management*. Even the generic "personnel actions" finding, relying upon Plaintiff's Exhibit 38, involved Mr. Perry investigating allegations about a general manager.

Under binding authority in *Gray*, however, "exercis[ing] power to hire and fire general managers" "proves nothing about whether [he] had the authority individually to control employment terms of lower-level employees." *Gray*, 673 F.3d at 355–56. And "a status-based inference of control cannot alone suffice to create a genuine fact issue whether [defendant] had power to hire and fire bartenders." *Id.* at 356. Rather, in "cases in which officers and shareholders of corporations have been held liable as FLSA employers[,] [e]ach case [] involves defendants who exerted actual operational control from which a fact finder could infer power to hire and fire." *Id.* at 355; *see also Heath*, 2022 WL 827654, at *5 (recommending summary judgment even when alleged employer "participated in hiring decisions" about managers, but not the employees at issue); *see also Orozco*, 757 F.3d at 449; *Muslow v. Louisiana State Univ. & Agric. & Mech. Coll., Bd. of Supervisors*, No. 22-30585, 2023 WL 5498952, at *10 (5th Cir. Aug. 24, 2023) ("[B]eing one of several voices contributing to a decision. . . to terminate Plaintiffs does not transform him into an employer."). The first factor is therefore legally and factually unsupported.

On factor (2), supervising and controlling conditions of employment, the FF/CL finds generically that Mr. Perry was involved in "staffing levels," the only support for which is Plaintiff's Exhibit 29 in which "Mr. Perry was in last night and was not happy with the amount of staff we had on hand." That one-off email is like in *Gray* when the alleged employer had three interactions with a specific employee, including ordering to "serve specific individuals," which the Fifth Circuit concluded were "isolated events [that were] too paltry to support an inference of control[.]" 673 F.3d at 356–57. "Plaintiffs presented no evidence that [Mr. Perry] personally set

their schedules, or otherwise exerted control over their working conditions," just like the Plaintiffs failed in *Heath*, when the owner participated in operational decisions like setting the club's hours. 2022 WL 827654, at *5. Or *Orozco* when the alleged employer sent "numerous emails," controlling the restaurant operations such as "implement[ing] changes to menus" or "contract[ing] with vendors for suppliers," and "direct[ing] various advertising plans." 757 F.3d at 450 These were merely "setting broad policies for the entire franchise and providing assistance to franchisees," and not "legally sufficient evidence in support of the second element" that he controlled and supervised work schedules. *Orozco*, 757 F.3d at 450–51. The second factor is legally and factually unsupported.

On factor (3), determining the rate and method of payment, the only evidence is that Mr. Perry "was involved in setting the mandatory tip share percentage taken from employees' pay checks at 4.5%." Dkt. at 4. The *amount* of mandatory tip share is not at issue, only *who* paid it. That diverges from the evidence needed under *Orozco* and *Heath*. In *Orozco*, it wasn't enough that the alleged employer participated in "meetings" about the employee's pay, even if it was inferable that the employer "was in effect advising" on pay. 757 F.3d at 451. And in *Heath*, it was not enough that the alleged employer "gives input, along with the other owners, on the compensation for managers." 2022 WL 827654, at *5. The "'participation in joint decisions' regarding manager compensation 'proves nothing' about whether he had "'the authority individually to control employment terms of lower-level employees.'" *Id.* (quoting *Gray*, 673 F.3d at 355). Rather, in *Heath*, this Court rejected employer status when plaintiffs presented no evidence that the individual "*personally exercised any control* over how dancers made money at the club." *Id.* (emphasis added) (citing *Grim Hotel Co.*, 747 F.3d at 972). The only alleged evidentiary support for this factor is "that the senior leadership agenda has also included tips and tip share"—like the joint meeting in *Orozco*. *See* Dkt. 227 at 3. Or joint "involvement" in setting the 4.5% tip rate like the joint decision in *Heath*. Neither is any evidence of factor (3), so the factor is unsupported.

On factor (4), maintaining employment records, there is no finding by the Court, and Plaintiffs presented no argument that Mr. Perry personally maintained employment records. *See generally* Dkt. 227; Dkt. 218 at 40.

There is no, or insufficient, evidence to support the conclusion that Mr. Perry is an FLSA employer, and the Court should alter the findings and amend the judgment accordingly.

## IV.    Other Points of Manifest Error

Defendants submit that the Court also should amend or add findings under Rules 52(b) and 59(a)(2), and amend the judgment under Rules 52(b), 59(a)(2), and 59(e)—or else grant a new trial under Rule 59—all based on the following additional manifest errors:

### A.    The Court improperly disregarded Defendants' evidence of lunch parties.

The FF/CL finds that Defendants' private lunch event evidence was insufficient to change its analysis with respect to the status of the AM employees as tip pool ineligible because the list of private lunch events "does not indicate who served customers during those lunch parties." Dkt. 227 at 21. Such a heightened standard of specificity is legally improper, unnecessary, and impractical because it essentially requires restaurants to keep itemized receipts indicating all employees who served a particular customer at any time. The evidence presented at trial reflects there would be no reason to have an "AM" food runner on duty except to cover a private lunch event. *See* Day 2, Tr. at 39:21-25, 41:17-23, 144:4-9.  So any instances where there was an "AM" food runner would be days with a private lunch event. *See id.* And any of these "AM" food runners should be excluded from an assessment of minimum wage violations.

The trial evidence proves the only one AM host present at a time, *see* Day 1 Tr. at 135:1–135:7 (citing exhibit P-192 discussing "an a.m. shift" or hosts "to assist with answering phones), meaning the host would be the one to interact with lunch party guests as they enter the restaurant's main entrance in front of the host stand—contrary to the finding that "[t]he document . . . does not give the Court reason to assume the employees staffed to serve customers were consistently the same group of employees working the AM shifts described above." Dkt. 227 at 21.

The FF/CL's finding just discussed—that the "document [of private lunch parties] does not give the Court reason to assume the employees staffed to serve customers were consistently the same group of employees working the AM shifts described above"—cites Plaintiffs' Proposed Findings of Fact and Conclusions of Law, Dkt. 219, p. 40. On page 40, Plaintiffs cite Gary Gutierrez's corporate representative deposition at 81:12-83:16 and 92:25-93:22, and the Day 2 Trial Transcript at 55:8-56:13. These citations do not support the above finding that AM employees present in the restaurant during a private lunch event—when customers were in the restaurant entering at the host stand and walking through the main dining room to their event table where support staff are preparing the dining room for service—did not have customer interaction.[4] If a support staff employee is scheduled to work when a private lunch party occurs, he or she likely interacts with customers as part of the support staff team and thus have at least *de minimis* customer interaction.[5] *See, e.g.*, *Montano*, 800 F.3d at 194. To hold otherwise means, for instance, a server is not a tipped employee until the first customer enters the restaurant and the server directly speaks with that customer—the exact parsing that *Restaurant Law Center* disapproved of as unworkable.

According to the FF/CLs, even if AM bussers, hosts, food runners, and the like interacted with customers during private lunch events, it would create a dual jobs scenario that would not change the outcome. Dkt. 227, p. 32. But at the very least, it changes the potential damages recoverable. The dual jobs regulation in 29 C.F.R. § 531.56(e) is clear that a tip credit is lost only for the specific time spent in a non-tipped occupation.

---

[4] Mr. Gutierrez's deposition transcript citations on pages 92 and 93 consist of Plaintiffs' counsel questioning him about the TripleSeat report itself and how the document was created. The trial transcript citation consists of Plaintiffs' counsel's objections to Perry's private lunch event list.

[5] Mr. Gutierrez actually testified to facts including the following: (1) the private lunch event document would tell him "there would be a need for staff to be there" because there were customers present, Gutierrez Dep. p. 87:25-88:1, (2) if there was an AM busser, they would be utilized for the private lunch event, *id.* at p. 89:8-15, (3) if there were two bussers scheduled, they could both be preparing the restaurant and waiting on the private party, *id.* at p. 90:14, and (4) he would look at additional documents, like schedules, to see which support staff were present before 3:30p.m., *id.* at p. 91:5-6, 92:12-18.

**B. The Court's findings on A.M. hosts should be amended.**

The FF/CL finds that "the customer interaction was, at most, minimal" for AM Hosts. *See* Dkt. 227 at 18. This finding is clearly erroneous because it ignored evidence presented by Defendants about AM lunch parties, guests coming into the restaurant before opening, and hosts crafting birthday cards for delivery to guests during their dining experience. *See* Day 1, Tr. at 77:20, 79:7-9, 236:6-17 (phone calls to guests); 89:11-24 (birthday cards); Day 1, Tr. at 236:17-24, Day 2, Tr. at 30:2-12, 34:22-24, 35:19-21, 36:8-11 (gift cards). That's why Perry's locations unlock their doors at 11:00am for all these interactions, with "[a] lot of interaction that happens at that time." Day 2, Tr. at 30:1-12. The Court also manifestly erred in disregarding evidence about the AM hosts having direct telephonic interactions with customers prior to their dining experience by analogizing the interactions to that of "unpleasant, confrontational, or hostile interactions" between bar patrons and bouncers. Dkt. 227 at 19 (citing *Wajcman v. Investment Corp. of Palm Beach*, No. 9:07-cv-80912, 2008 WL 783741, at *4 (S.D. Fla. Mar. 20, 2008); *Stewart v. CUS Nashville, LLC*, No. 3:11-cv-342, 2011 WL 2600622, at *3 n.2 (M.D. Tenn. June 29, 2011)).

From there, the Court committed legal error with respect to the AM hosts and lunch party issue. *See* Dkt. 227 at 23. The Court assumed, for the sake of argument, that even if the AM hosts (1) called and confirmed reservations and (2) greeted AM lunch parties, they would nevertheless not qualify for tip distributions "because of their other duties." Yet the FF/CL makes no findings on what those other duties are. *Cf.* Dkt. 227 at 7 (finding that "[t] job duties of the AM . . . hosts included cleaning restrooms, sweeping and scrubbing floors, sweeping debris in the parking lot, checking the landscaping and for trash in flower beds, polishing dirty exterior glass around the restaurant, cleaning, sweeping, and setting the patio, polishing silverware, restocking, and preparing kitchen items." (citing Dkt. 176 at 19)). The evidence cited includes only checklists for bussers. It says nothing about hosts. *See* Dkt. 158-37–40. There was no evidence presented at trial that AM hosts performed any of these tasks.

Further, the Court's conclusion that "even if Perry's had established evidence that AM Hosts on regular occasions spent a portion of a four-hour AM shift interacting with customers by

seating them during a lunch party, (which Perry's did not)," Dkt. 227, at 23, is insupportable when viewed in the face of testimony establishing that hosts did, in fact, seat guests. Day 1, Tr. at 241:22-23 ("a hostess will be there to seat the guests"), Day 2, Tr. at 116:7-10.

**C. The Court's findings as to AM server assistants and food runners are clearly erroneous.**

The FF/CL rests on a finding that "customers typically were not being served in the restaurant for the AM Server Assistants and Food Runners to interact with and from whom they could receive tips[.]" Dkt. 227 at 17-18. But the Court heard the following testimony: "And there's been references here to food runners who work before 4:00. Would food runners be involved in such luncheons? A. If it required it. I mean, I think that the size of the party matters from that perspective. If it's a party of 10, it probably can be handled by the staff that's there. But if it's a party of a hundred, which does happen, there will be a lot of people do a luncheon for a hundred and that's where it could be deemed -- it could be deemed that that would be necessary to execute the party." Day 1, Tr. at 242:2-11.  AM Server Assistants and Food Runners were working lunch parties and serving customers and, as a result, indisputably had customer interaction. *See Montano*, 800 F.3d at 194 ("the coffeeman began wearing a uniform and carried large trays to the dining room about once per week.").

**D. The Court's definition of "AM" staff as "staff beginning their shifts before 4:00 pm . . . and finishing their shift before 5:00 pm" is clearly erroneous.**

The Court's selection of a 5:00 p.m. clock-out time is unsupported by any evidence in the record. *See* Dkt. 227 at 6. The parties stipulated that the Perry's locations at issue opened for service at 4:00 p.m. *See* Dkt. 184-1 at 3–4. This is consistent with the Court's order on summary judgment. Dkt. 190, adopting Dkt. 176, p. 19, n. 5 (explaining restaurants opened at 4:00p.m., where R&R draws a distinction throughout on the time Perry's restaurants opened to the public). There is no evidence in the record that any of the job codes, other than AM Bussers, performed any work other than customarily and regularly tipped work that served a customer service function or presented the opportunity for more than de minimis customer interaction. Still, even as to bussers and server assistants, the evidence at trial demonstrated that AM bussers start serving bread

and water to customers as soon as the restaurant starts seating customers, which is no later than 4:00p.m.. Day 2 Tr., at 38:20-22, 81:13-15 (Munns) (testifying at 3:30 or 3:45, if a customer is seated, "they have access to sit down and get bread. The busser's going to bring them bread. The busser's going to help them with water."); 115:17-20 (Cortes) (Q: "Tell us about the service that a customer would receive if they walk in at 3:45 or 3:50p.m. on the day that the restaurant is not advertised as open until 4:00 …. During the time when Perry's had a server assistant, would that also be the case where they would serve bread to the table?" A: "Yes.").  So even the AM bussers served a customer service function and had more than de minimis customer service action.

E. **The Court's finding about pre-opening customer presence incorrectly states the record on the extent of customer interaction.**

Contrary to the clearly and manifestly erroneous finding that pre-opening customer presence was "only occasional gift-card/lost-item" visits, Dkt. 227 at 8, 20, the evidence showed hosts routinely made calls to guests and wrote birthday cards for guests. Day 1, Tr. at 77:20, 79:7-9, 236:6-17 (phone calls to guests); 89:11-24 (birthday cards). The evidence shows Perry's locations routinely hosted lunch events. Day 1, Tr. at 234:18-25, 241:11-242:1 The evidence shows the doors to Perry's locations opened at 11:00 a.m. and that customers often entered to purchase various items or to tour the restaurant or to drop off items for later events; "[a] lot of interaction that happens at that time." Day 2, Tr. at 30:1-12; *see also See* Day 1, Tr. at 77:20, 79:7-9, 236:6-17; 89:11-24; Day 1, Tr. at 236:17-24, Day 2, Tr. at 30:2-12, 34:22-24, 35:19-21, 36:8-11. And that extends to AM Bussers; even those that did not serve lunch parties would have often been the first person with whom a guest entering the restaurant early would interact. *See* Day 2 at 34:16-35:12. Under a correct understanding of customer service functions expressed in *Restaurant Law Center* and the revised Department of Labor Regulations, *see infra* Part IV.F., or even a correct application of *Montano*'s customer interaction test, *see infra* Part IV.G, all of the AM Employees were eligible for the tip pool. *Contra* FF/CL at 17-24.

**F.** ***Restaurant Law Center*** **and revisions to the Department of Labor Regulations displaced** ***Montano.***

As explained above, Defendants' alleged violations were not willful and were reasonable interpretations of FLSA's requirements in good faith like *Restaurant Law Center* and changing Department of Labor regulations. *See supra*, Part II. Defendants maintain the changes made to the Department of Labor regulations as understood in *Restaurant Law Center* implemented a new approach about whether the job category was performing a customer service function. *See* 85 Fed. Reg 86756-01 (Dec. 30, 2020) (removing the underlying language relied upon in *Montano*); *see also Restaurant Law Center*, 115 F.4th at 409 (criticizing "temporality" aspect of Department of Labor regulations that are also in *Montano*); Dkt. 164 at 17-19 (Summary Judgment Response explaining why *Montano* no longer applies). Under the customer service function test, all AM Employees would be considered eligible for the tip pool.

**G. The Court's misapplication of *Montano*'s customer interaction test.**

As explained above in the willfulness and good faith section (Part II), *Montano*, like Defendants' approach, focuses on the *amount* of interaction, but the Court seemed to apply the *Montano* concurrence instead and applied the bouncer logic from *Wacjman* that was "contrary to the majority," in the concurrence's own words. 800 F.3d at 195–96 (Dennis, J., concurring). The Court should reconsider its reading of *Montano* and apply the majority opinion that once a week would be enough, 800 F.3d at 194, particularly when on remand, the jury in *Montano* determined that the coffeeman was eligible to participate in the tip pool. *Montano v. Montrose Rest. Assocs., Inc.,* 726 F. App'x 972, 973 (5th Cir. 2018) (affirming jury verdict that the coffeeman was regularly and customarily tipped, thus eligible for tip pool).

**H. The Court's treatment of side work.**

Throughout the FF/CL, the Court ignores the realities of side work and the fact that tipped employees can sometimes do non-tipped tasks. *E.g.* Dkt. 227 at 15, 23. That ignores Department of Labor regulations, as well as *Restaurant Law Center*, that side work can be permissible. *See* SJ, R&R, Dkt. 176 (citing *Restaurant Law Center*); Dkt. 180 (adopting Dkt. 176).

## I.   Other Manifest Errors

The Court also committed manifest error by determining that service well employees were not eligible tip pool recipients. The DOL has issued guidance explaining that barbacks are customarily and regularly tipped. *See* 86 Fed.Reg. 60114, 60116; U.S. Department of Labor, Opinion Letter, FLSA 2009-12, (June 12, 2009)[6]. There is no evidence in the record that Perry's service well employees do not perform customer service functions, the evidence shows they did.

Further, the Court's finding that bartenders who clock in before two and out before five are eligible tip pool recipients contradicts the Court's simultaneous holding that none of the other positions qualify as tip pool eligible on the basis that no customers were present.

The Court also improperly applied a workweek rule instead of a shift basis rule. *See* Dkt. 227 at 16. Defendants contend the Court must look at the duties of the employee across the entire workweek, just as the Fifth Circuit instructed the trial court in *Montano* where the coffeeman appeared in the front of the house once a week. *See Montano*, 800 F.3d at 194 ("the coffeeman began wearing a uniform and carried large trays to the dining room about once per week.").

### Requested relief

This Court should amend its findings and conclusions and/or make new or additional ones under Rules 52(b) and 59(a)(2) in accord with the arguments presented above, and should alter or amend the judgment under Rules 52(b) and 59(e) as set forth above. Defendants therefore ask that the Court enter judgment in their favor on Plaintiffs' claims or reduce Plaintiffs' damages to zero. But at a minimum, Defendants request that the Court rule in amended or additional findings and conclusions, and enter an amended judgment, that Defendants did not "keep" any tips, that Defendants alleged violations were not willful, that Defendants did not act in bad faith, and that Christopher V. Perry does not qualify as an employer under the FLSA.  Alternatively, the Court should grant a new trial under Rule 59(a). Defendants also pray for all other relief to which they are entitled.

---

[6] https://www.dol.gov/sites/dolgov/files/WHD/legacy/files/2009_01_15_12_FLSA.pdf

Respectfully submitted,

*/s/ Matt Dow*

Lionel M. Schooler
Texas Bar No. 17803300
lschooler@jw.com
Jamila M. Brinson
Texas Bar No. 24074867 (pro hac vice)
jbrinson@jw.com
Jaclyn Staple
Texas Bar No. 24114890 (pro hac vice)
jstaple@jw.com
Michael A. Drab
Texas Bar No. 24115826
mdrab@jw.com
JACKSON WALKER LLP
1401 McKinney, Suite 1900
Houston, Texas 77010
(713) 752-4200
(713) 308-4112 (fax)

Matt Dow
Texas Bar No. 06066500
mdow@jw.com
JACKSON WALKER LLP
100 Congress Street, Suite 1100
Austin, Texas 78701
(512) 236-2000
(512) 236-2002 (fax)

**ATTORNEYS FOR DEFENDANTS**

**CERTIFICATE OF SERVICE**

I certify that a true and correct copy of the above was filed with the Court's ECF filing system, which will provide electronic notification to all counsel who have appeared in this action, and that a courtesy copy was sent by email to counsel for Plaintiffs on this 8th day of December 2025.

*/s/ Matt Dow*

Matt Dow